**CAPITAL LEGAL FOUNDATION,**
Appellant,

v.

**COMMODITY CREDIT CORPORATION,**
et al.

No. 82–1350.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 14, 1983.
Decided June 17, 1983.

---

Anthony S. Murry, Washington, D.C., for appellant. James A. Moody, Washington, D.C., was on the brief for appellant.

Al J. Daniel, Jr., Atty., Dept. of Justice, Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Richard K. Willard, Deputy Asst. Atty. Gen., and Anthony J. Steinmeyer, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellees.

Before TAMM and GINSBURG, Circuit Judges, and GORDON,* United States Sen-

* Sitting by designation pursuant to Title 28 U.S.C. § 294(d).

ior District Judge for the Western District of Kentucky.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Political events and the state of the economy in Poland in late 1981 set the stage for this challenge by Capital Legal Foundation (Capital) to action taken by the Commodity Credit Corporation (CCC). As part of the United States response to the situation in Poland, CCC, guarantor of certain debts Poland owed to United States creditors, consummated agreements with the creditors to assume the debts immediately, on condition that the creditors not declare Poland in default. Capital, an organization whose mission involves monitoring agencies engaged in economic regulation, commenced this lawsuit to invalidate CCC's action.

Capital claims no material interest in the Polish debt situation, no substantive rights under the statutory charter or regulations of CCC, and no injury as a result of the end-product of CCC's action. Instead, Capital alleges deprivation of a procedural right. CCC's regulations required creditors to declare their debtors in default before turning to CCC for payment. But CCC's agreements to acquire Poland's debts required the precise opposite: the creditors were to refrain from declaring Poland in default. The default declaration requirements could be abandoned, Capital maintains, only through rulemaking governed by the Administrative Procedure Act (APA), 5 U.S.C. § 553, attended by public notice and comment. Had CCC proceeded that way, Capital asserts, Capital would have submitted comments in an effort to influence the agency's course. Alleging as its injury denial of the opportunity to comment, Capital seeks a court decree that CCC impermissibly altered its payment procedures and must follow the rules prescribed in its published regulations until those rules are properly amended.

The district court dismissed Capital's complaint for lack of standing. *Capital Legal Foundation v. Commodity Credit Corporation,* No. 82–00398 (D.D.C. Mar. 19, 1982), Joint Appendix (J.A.) 46–61 [hereafter District Court Opinion]. We affirm the district court's judgment. Although it claims a vibrant interest in commenting prior to agency action, Capital concedes it is not governed, adversely affected, or aggrieved by the substance of the agency decision it seeks to reopen. In essence, Capital first asserts that CCC has violated published regulations, it then labels the asserted violation a rulemaking unattended by public notice and comment. A substantive action taken by the agency is thus described by Capital as a flawed procedural move. We hold that characterization of this order will not do to qualify Capital as a party positioned to overturn CCC's action.

## I. BACKGROUND

### A. *CCC and the Polish Debts*

CCC is a federally chartered corporation that operates within the Department of Agriculture.[1] One of its functions is to promote development of foreign markets for, and export sales of, U.S. agricultural products. 15 U.S.C. § 714c(f). CCC runs two agricultural exports payment guarantee programs, the "Noncommercial Risk Assurance Program," and the "Export Credit Guarantee Program." These two programs, while they insure against different risks, are almost identical in design and operation. Under both programs CCC contracts to guarantee credits extended to foreign purchasers by U.S. agricultural exporters. Through the guarantee contracts, risks that the purchaser will fail to pay are transferred from U.S. exporters and their financing institutions to CCC. CCC's guarantees cover foreign defaults occasioned by both "political" (noncommercial) and "commercial" factors.

---

1. CCC's activities are financed by a capital stock fund of one hundred million dollars. CCC has, in addition, authority to borrow up to twenty-five billion dollars. 15 U.S.C. §§ 714b(i), 714c, 714e (1976 & Supp. III 1979).

Two sets of regulations govern CCC's administration of the agricultural exports payment guarantee programs. 7 C.F.R. §§ 1487.1–.15; 7 C.F.R. §§ 1493.1–.15. These regulations were promulgated, after notice and comment (informal rulemaking) proceedings, in January 1978 and October 1980.[2] They detail the procedures a U.S. creditor is to follow, upon default by a foreign debtor, in securing payment under CCC's guarantee. If a foreign payment is not received when due, the creditor is promptly to provide CCC with a "notice of default," and within thirty days thereafter file a "claim for loss." 7 C.F.R. §§ 1487.8, 1493.8. "Upon receipt of th[is] information" CCC "shall determine whether or not a loss has occurred for which CCC is liable. . . ." 7 C.F.R. §§ 1487.9(a), 1493.9(a). Following a liability determination, CCC remits to the U.S. creditor the amount of the loss covered by the guarantee contract. CCC is then subrogated to the right to payment from the foreign debtor. 7 C.F.R. §§ 1487.9(d), 1493.8(b)(3)(iv).

Under these export encouragement programs CCC guaranteed about $800 million of debt owed by Poland to U.S. banks and exporters.[3] On December 13, 1981, the Government of Poland declared martial law within that country. By early 1982, Poland was unable to pay western creditors; overdue amounts included about $71 million owed under sales contracts guaranteed by CCC. District Court Opinion at 5, J.A. 50.

Several strategies developed in this country in response to the Polish economic and political situation. One of them was for the United States to purchase debts owed by Poland to U.S. creditors. The large debt so consolidated was to be used as an economic lever to further United States foreign policy goals. District Court Opinion at 6–7, J.A. 51–52.[4]

Accordingly, at the end of January 1982, CCC contacted ten banks and two exporters whose claims against Polish entities were guaranteed by CCC. CCC offered to assume at once outstanding CCC-guaranteed obligations of Poland to these twelve creditors. To accept the offer the creditors had to agree, contrary to CCC's regulations, to refrain from filing a notice of default on the payments then overdue. The Government so specified in the belief that informal pressure for repayment would better serve United States foreign policy objectives than would formal declarations of default. *Id.* All twelve creditors who received the January 1982 offer accepted it. Brief for Appellees at 6 n. 1.

## B. *Capital's Complaint*

Capital is a non-profit law firm that

---

**2.** Notice of the proposed 7 C.F.R. §§ 1487.1–.15 regulations was published on October 3, 1977. 42 Fed.Reg. 53628 (1977). CCC received written responses from eight commentators; none proposed changes relevant to the default declaration procedures on which Capital builds its complaint. 43 Fed.Reg. 4033–34 (1978). The final regulations were announced on January 31, 1978. *Id.*

Notice of the proposed regulations now codified at 7 C.F.R. §§ 1493.1–.15 was published on June 5, 1980. 45 Fed.Reg. 37854 (1980). CCC received written responses from thirty-six commentators; none addressed the default declaration procedures of interest to Capital. 45 Fed. Reg. 64895 (1980). Final versions of these regulations were promulgated October 1, 1980. *Id.*

Congress has authorized, but has not required, CCC to adopt rules or regulations as a means of implementing its programs. 15 U.S.C. § 714b(d).

**3.** Statement by Robert D. Hormats, Assistant Secretary of State for Economic and Business Affairs, Before the Subcomm. on Foreign Operations of the Senate Appropriations Comm., Feb. 9, 1982 at 4. J.A. 17. In addition, as of early 1982, Polish banks owed the United States Government about $740 million on credits granted directly by CCC, and about $1.3 billion in unguaranteed credits. Poland owed western governments and private banks about $26 billion in all. *Id.*

**4.** The district court noted specifically the Government's assertion that CCC's offer was "intended to minimize the possibility that a CCC-guaranteed creditor of Poland, by filing a formal 'notice of default,' will create apprehension among U.S. allies over the financial position of allied banks that hold Polish debts." District Court Opinion at 7 n. 8. *See also id.* at 2–3, 5–6; Statement, *supra* note 3, J.A. 15–16, 18–19.

regularly monitors federal activity related to economic regulation, informs members of the public and press about these activities, participates in agency rulemaking and, upon request, in the legislative process.... Capital has focussed special attention on the Department of Agriculture.... Capital's business ... is, in part, to participate in governmental proceedings in order to present alternative views that would otherwise remain unrepresented ....

Brief for the Appellant at 12; Capital Complaint, J.A. 7.

Following CCC's January 1982 offer, Capital brought suit in the district court, alleging that CCC had "effectively amended its regulations, in violation of Capital's rights to notice and comment under the [APA]." *Id.* at 1–2. CCC's offer to the twelve creditors, Capital asserted, constituted "*de facto* rulemaking*" in that it reduced the information the regulations required the creditors to submit and "significantly omit[ted] the requirement that the banks file a notice of default and certify that payment has not been received." *Id.* at 10.

In support of its claim Capital cited APA subsections 553(b) and (c), which provide that when an agency engages in informal rulemaking it must give notice and afford "interested persons" an opportunity to comment.[5] *Id.* Capital contended it had been injured by CCC's abandonment of the default declaration rules without conducting an APA-governed rulemaking "in that [Capital's] task of informing the public

about the economic impact of proposed regulatory changes and providing appropriate, responsive comments to the CCC ha[d] been jeopardized." *Id.* Capital further described as its injury "depriv[ation] of the opportunity of having its comments ... fairly considered before CCC reache[d] its final decision." *Id.* at 10–11. While Capital credibly maintains that it would have commented had CCC tested through rulemaking the proposal to purchase the outstanding Polish debt, Brief for the Appellant at 12, Capital readily concedes that it has suffered no injury stemming from the substance of CCC's offer to the banks and exporters.[6]

Capital sought in the district court (1) a declaration that CCC's January 1982 offer was "unlawful and therefore invalid"; (2) "[a]n injunction against further CCC action under the repurchase plan"; and (3) a writ of mandamus directed to the appropriate CCC official "requiring his compliance with the public notice and comment provisions of the Administrative Procedure Act prior to taking any action with respect to the assumption of debts owed by Poland." Capital Complaint, J.A. 11.[7]

## C. *District Court Decision*

The district court granted CCC's motion to dismiss; it reasoned:

[T]he CCC's offer of repurchase, even if a violation of applicable regulations or a de facto rulemaking in contravention of the procedural requirements of the APA, threatens [Capital] with no palpable inju-

---

**5.** Section 553(b) provides in pertinent part:
General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. 5 U.S.C. § 553(b).
Section 553(c) provides in pertinent part:
After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making....
5 U.S.C. § 553(c).
Section 551(5) defines rulemaking to mean "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5).

**6.** Brief for the Appellant at 7 (the district judge "correctly states ... that Capital claimed no injury from the underlying CCC offer [to the banks and exporters]"); *see also id.* at 16, 17, 18.

**7.** In this court, however, Capital stated that it "has not sought an injunction"; instead, it has only asked us to decide whether it "has standing to demand some sort of compliance with the APA in this matter." Capital further stated that there are "many options available to the government *within* the law," and that the district court could fashion a "variety of remedies." Reply Brief for the Appellant at 9 (emphasis in original).

ry, either economic or otherwise. The Court cannot accept Capital's argument that because Capital asserts a specialized interest in the subject of federal economic regulation, Capital . . . has standing to challenge on procedural grounds a CCC decision that has absolutely no effect, economic or otherwise, on Capital.

. . . Without alleging some palpable injury incurred as a result of the violation of its purported procedural rights, Capital cannot meet the test for standing under the APA . . . .

District Court Opinion at 14–15, J.A. 59–60.[8]

## II. DISCUSSION

 A party who would complain that agency action has violated the Constitution, a statute, or a regulation, must be adversely affected by that action. A sincere, vigorous interest in the action challenged, or in the provisions of law allegedly violated, will not do to establish standing if the party's interest is purely ideological, uncoupled from any injury in fact, or tied only to an undifferentiated injury common to all members of the public. *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), applied this rule to deny standing to a

plaintiff-taxpayer who challenged the constitutionality of a federal appropriation.[9] In *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the rule operated to deny standing to a plaintiff organization that invoked federal statutes and regulations to challenge agency action not alleged to affect any of the organization's members.[10] Injury in fact, caused by the substance of an agency's action or inaction, is an essential element of a plaintiff's complaint. The injury need not be large, *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973), but it must exist and be distinct.

 This is not to say that a party must have a "legal interest" in the agency action challenged. That test for standing had currency at one time, *see Tennessee Electric Power Co. v. Tennessee Valley Authority,* 306 U.S. 118, 137–38, 59 S.Ct. 366, 369–70, 83 L.Ed. 543 (1939), but it has been replaced by the more expansive "zone of interests" test. *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).[11] The "zone" test is passed if a

**8.** CCC urged several other grounds in support of its motion to dismiss: statutory prohibition of injunctive relief against CCC, 15 U.S.C. § 714b(c); interference with the executive's conduct of foreign affairs; the "foreign affairs" exception to the APA's informal rulemaking procedures, 5 U.S.C. § 553(a)(1); the validity of the offer to the banks and exporters under CCC's charter without resort to rulemaking, 15 U.S.C. § 714b(g); the validity of CCC's action even if rulemaking should have preceded it. The district court did not reach these issues, District Court Opinion at 10 n. 10, J.A. 55, nor do we.

In this court, both sides moved for summary disposition. Capital's motion for summary reversal, and CCC's for summary affirmance, were denied, without opinion, on August 4, 1982.

**9.** *See also Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (members of the public lacked standing to challenge town's zoning ordinance as in violation of constitutional and statutory require-

ments); *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (taxpayer lacked standing to challenge constitutionality of statute permitting secret CIA expenditures); *Ex parte Levitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937) (citizen and member of the bar of the Supreme Court lacked standing to challenge constitutionality of appointment of Supreme Court Justice).

**10.** *See also Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (indigent plaintiffs lacked standing to challenge tax exemption granted to hospitals allegedly in violation of Internal Revenue Code); *Association of Invest. Brokers v. SEC,* 676 F.2d 857, 862, 864 (D.C.Cir.1982) (petitioners lacked standing to challenge as contrary to various statutes and the Constitution SEC's adoption of a form that the SEC itself did not require petitioners to use).

**11.** *See also Investment Co. Inst. v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); *Arnold Tours, Inc. v. Camp,* 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d ·

plaintiff's interest in the agency action appears to fall within the ambit of the constitutional clause,[12] statute,[13] or regulation allegedly violated. Plaintiff's interest need only be "arguably within the zone of interests to be protected or regulated" by the law under which the claim arises. *Id.* at 153, 90 S.Ct. at 830.

In *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838 (D.C.Cir.1982), for example, we held that a disappointed bidder on a contract had standing to challenge an agency's alleged failure to abide by statutes and regulations applicable to contract awards. It was evident that the plaintiff had suffered injury in fact, and that the injury was arguably within the zone of interests of the relevant laws regulating contract awards. In contrast, we held that the same disappointed bidder lacked standing to seek review of the agency's alleged maladministration of the contract it had awarded. It appeared improbable that the disappointed bidder suffered any additional injury from that maladministration, and even if such injury were assumed, the regulations governing the administration of contracts were designed to protect the government against injury from contractors' defaults, not to protect the interests of disappointed bidders or other third parties.

■ In sum, to establish standing to challenge an agency's handling of its affairs a plaintiff must plausibly (1) allege injury in fact derived from the agency's action or inaction, and (2) assert that the injury is arguably within the zone of interests protected or regulated by the law on which the complaint is founded. *See Consumers Union of United States, Inc. v. Federal Trade Commission,* 691 F.2d 575, 577 n. 9 (D.C.Cir. 1982) (en banc); *Control Data Corp. v. Baldrige,* 655 F.2d 283, 288 (D.C.Cir.1981). The standing inquiry focuses on the substance of the agency action, its adverse impact on the plaintiff, and the types of interests that the applicable law is designed to protect. The would-be plaintiff's interest in the relevant law is ascertained by injury in fact; the law's interest in the would-be plaintiff is determined by the "zone of interests" test. Mutuality of interest must be credibly asserted.

■ Despite artful pleading, Capital cannot disguise the essence of its complaint. In its presentation to this court, Capital explained that it "sought to enjoin [CCC] from assuming obligations owed by Poland to various American creditors, unless and until [CCC] compl[ies] either with present ... regulations or with new regulations promulgated in accordance with the APA." Reply Brief for the Appellant at 2. But Capital is a stranger to CCC's present regulations in the sense that it is not governed or materially affected by them. *See generally* Stewart, *The Reformation of American Administrative Law,* 88 Harv.L.Rev. 1667, 1734–47 (1975). Therefore Capital lacks standing, as the foregoing discussion clarifies, to complain to a court that CCC violated current regulations and so should be ordered to conform to them.

Lacking a stake courts will recognize in CCC's adherence to its regulations, Capital presses a beguiling argument. CCC's offer to the banks and exporters would have been lawful, Capital states, if accomplished through a rulemaking governed by the APA. In such a rulemaking, Capital as-

192 (1970). *Cf. Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38–39, 39 n. 19, 96 S.Ct. 1917, 1924–25, 1925 n. 19, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975); *Linda R.S. v. Richard D.,* 410 U.S. 614, 616–19, 93 S.Ct. 1146, 1147–49, 35 L.Ed.2d 536 (1973).

12. *See, e.g., Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. 318, 320 n. 3, 97 S.Ct. 599, 602 n. 3, 50 L.Ed.2d 514 (1977) (zone of interests test applied to the Commerce Clause).

13. *See, e.g., Howes Leather Co. v. Carmen,* 680 F.2d 818 (D.C.Cir.1982) (per curiam) (consumer of stockpiled goods arguably within zone of interests of Stockpiling Act); *Copper & Brass Fabricators Council, Inc. v. Department of Treasury,* 679 F.2d 951 (D.C.Cir.1982) (copper fabricators interests fell outside zone of interests of statute authorizing agency to reduce copper content of the penny); *Control Data Corp. v. Baldridge,* 655 F.2d 283 (D.C.Cir.1981) (suppliers of data processing equipment interests fell outside zone of interests of statute enacted to promote efficient procurement).

serts, it would have exercised its APA-created public participation right to comment. That right, Capital seeks to persuade us, is what gives it standing to maintain this action.

But to arrive at a right to participate in a rulemaking, Capital must detour around the charge it made at the outset—that CCC violated current regulations, a charge Capital may not complain of in court. Capital attempts the detour by stating it "alleged ... that CCC had violated its regulations only in order to aid in a showing that what occurred here was rulemaking, although not in accord with the APA." Reply Brief for the Appellant at 7.

We take it that Capital is saying: first, there would have been no violation if CCC had a rule that allowed it to direct or invite creditors not to declare Poland in default; second, instead of viewing CCC as a regulation violator,[14] we should regard the agency as having amended its rules to conform them to its conduct; third, we should recognize that the supposed amendment was improperly promulgated ("not in accord with the APA") because Capital received no notice of it[15] or opportunity to comment.

This strikes us as a good deal of make believe. Were we to accept Capital's imaginative argument, every asserted violation by an agency of its own regulations could be recharacterized "*de facto* rulemaking" outside the APA, and therefore arguably open to challenge as procedurally-flawed by any person who claims he, she, or it would have participated had the rulemaking occurred inside the APA.[16] We are certain that Congress, in adopting the APA, had no such universal standing design in mind.[17]

---

**14.** Of course, we do not determine whether CCC is or is not a rule violator since no party with standing to raise the question is before us.

**15.** *But see* 5 U.S.C. § 553(b), set out *supra* note 5, which specifies that general notice to the public through Federal Register publication is not required when all persons subject to a proposed rule are named and have actual notice.

**16.** "[I]t is customary to permit any person to participate in notice and comment rulemaking pursuant to 5 U.S.C. § 553." Stewart, *supra,* at 1748 n. 371a. Courts have often assumed that any member of the public may be "interested" for APA section 553(c) purposes. *See, e.g., Rodway v. United States Dep't of Agriculture,* 514 F.2d 809, 814 (D.C.Cir.1975); *Texaco, Inc. v. Federal Power Comm'n,* 412 F.2d 740, 744 (3d Cir.1969); *Pacific Coast European Conference v. United States,* 350 F.2d 197, 205 (9th Cir.1965); *Dow Chem. Co. v. Consumer Prod. Safety Comm'n,* 459 F.Supp. 378, 391 (W.D.La. 1978).

**17.** The APA's standing provision, section 702, states:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5 U.S.C. § 702. The legislative history makes it clear that the sole design of this section was to codify federal judge-made standing rules as they existed in 1946:

The Attorney General advised the Senate Committee on the Judiciary of his understanding that section [702(a)] was a restatement of existing law. More specifically, he indicated his understanding that section [702(a)] preserved the rules developed by the courts in such cases as *Alabama Power Co. v. Ickes,* 302 U.S. 464 [58 S.Ct. 300, 82 L.Ed. 374] (1938); *Massachusetts v. Mellon,* 262 U.S. 447 [43 S.Ct. 597, 67 L.Ed. 1078] (1923); *The Chicago Junction Case,* 264 U.S. 258 [44 S.Ct. 317, 68 L.Ed. 667] (1924); *Sprunt & Son v. U.S.,* 281 U.S. 249 [50 S.Ct. 315, 74 L.Ed. 832] (1930); *Perkins v. Lukens Steel Co.,* 310 U.S. 113 [60 S.Ct. 869, 84 L.Ed. 1108] (1940); and *Federal Communications Commission v. Sanders Brs. Radio Station,* 309 U.S. 470 [60 S.Ct. 693, 84 L.Ed. 869] (1940). [Citing S.Doc. 248, *infra.*] This construction of section [702(a)] was not questioned or contradicted in the legislative history. [Citing *American Stevedores, Inc. v. Porello,* 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011 (1947).]

United States Department of Justice, Attorney General's Manual on the Administrative Procedure Act 96 (1947); *see* Attorney General's Statement Regarding Revised Committee Print of October 5, 1945, *reprinted in* Administrative Procedure Act, Legislative History, S.Doc. 248 at 230, 413, 79th Cong., 2d Sess. (1946). All of the cited cases involved challengers substantively interested in, and adversely affected by, the agency's product or outcome; none involved a bare claim of a right to input in the agency's process.

Commenting on readings of section 702 that would work "a dramatic liberalization of standing in the law as of 1946," Professors Breyer and Stewart note: "There is no evidence that Congress contemplated such a change, or that it intended anything more than a codification of

### III. Conclusion

For the reasons stated, the judgment dismissing Capital Legal Foundation's complaint for lack of standing is

*Affirmed.*

preexisting judge-made standing law." S. Breyer & R. Stewart, Administrative Law and Regulatory Policy 931 n. 147 (1979). These commentators acknowledge, however, that the APA has not been perceived by judges as a

"static codification"; it does not freeze 1946 standing law but affords leeway for continuing reasoned development "in accordance with current perceptions and needs." *Id.* at 922.