**Ernest SARGENT, et al., Plaintiffs,**

v.

**John R. BLOCK, et al., Defendants.**

**Civ. A. No. 83–2727.**

United States District Court, District of Columbia.

Nov. 15, 1983.

Jack Stolier, Kathleen A. McKee, Edward Cooney, Food Research and Action, Washington, D.C., for plaintiffs.

Louis Wise, U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

### INTRODUCTION

The complaint in this case was filed on September 14, 1983 by four individuals, four city boards of education, one city school district and the National Anti-Hunger Coalition (hereinafter referred to as "plaintiffs"). On September 16, 1983, plaintiffs moved for a preliminary injunction against John R. Block, the Secretary of Agriculture, and Robert E. Leard, Administrator of the U.S. Department of Agriculture Food and Nutrition Service, (hereinafter referred to collectively as "defendants" or "the Secretary"). At the hearing on that motion the Court asked the plaintiffs whether the granting of the preliminary injunction would indeed amount to a granting of relief on the merits. Plaintiffs' counsel essentially agreed that a preliminary injunction would grant such relief. After argument on the preliminary injunction, the Court set up a schedule whereby plaintiffs were afforded an opportunity to respond to defendants' pending motion to dismiss, or in the alternative for summary judgment, since they had no opportunity to respond before the hearing. Since plaintiffs view the issues presented in this case as legal ones, devoid of any material fact in dispute, the plaintiffs responded to defendants' dispositive motion with their own cross-motion for summary judgment. By this process, plaintiffs have appropriately stated that they hope to present the merits of the case squarely before the Court, after they have been thoroughly briefed and argued, in the interests of judicial economy.

### BACKGROUND

As part of the Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 425–26 ("OBRA"), the USDA was directed to revise application procedures for the National School Lunch Program (NSLP) which it administers.[1] Under the NSLP, the State and schools participating are responsible for determining which students are eligible for no-cost or reduced cost lunches. The OBRA amendments to the NSLP focused on the eligibility of recipients under the program and in general made three significant changes. First, it required USDA to make the furnishing of Social Security numbers (SSNS) by adult household members a condition of eligibility for program benefits. See § 803(b) of OBRA, codified at 42 U.S.C. § 1758(d). Second, it authorized USDA to require verification of eligibility in the programs. See § 803(a) of OBRA, codified at 42 U.S.C. § 1758(b). Third, it mandated that school meals could not be provided unless applicants provided documentation of their eligibility to participate in the program. See § 803(a)(2)(C). The amendments also anticipated that a pilot study would be completed and provided,

> Notwithstanding any other provision of law, the Secretary of Agriculture shall conduct a pilot study to verify the data submitted on a sample of applications for free and reduced-price meals. In con-

---

1. The authority for this program is codified at 42 U.S.C. § 1751 *et seq.* Laudably, the NSLP provides financial assistance to schools so that all students can receive a nutritious lunch. It enables low-income children to receive meals at no cost or for a reduced price, and allows the schools to charge other students somewhat less than the full cost of the meal (Complaint, ¶ 33). USDA assists the States, primarily through grants of financial aid, in providing expansion of nonprofit school lunch programs. 42 U.S.C. § 1751 (Complaint, ¶ 34). The NSLP federal funding is generally limited to reimbursements for expenses of food costs and program administration. In order to participate States enter into written agreements, through their education agencies, with the Department of Agriculture whereby they undertake to administer the program in accordance with provisions of the Act, 42 U.S.C. § 1756 (Complaint, ¶ 35).

ducting the pilot study, the Secretary may require households included in the study to furnish social security numbers of all household members and such other information as the Secretary may require, including, but not limited to, pay stubs, documentation of the current status of household members who are recipients of public assistance, unemployment insurance documents, and written statements from employers, as a condition for receipt of free or reduced-price meals. § 803(c)

This section was codified at 42 U.S.C. § 1758 *note.*

The mechanics of undertaking these changes were merely outlined in OBRA and the specifics of implementation were left to the Secretary of Agriculture. Section 803(a) of OBRA provides

Eligibility determinations shall be made on the basis of a complete application executed by an adult member of the household. The Secretary, States and local school food authorities may seek verification of the data contained in the application. Local school food authorities shall undertake such verification of the information contained in these applications as the Secretary may by regulation prescribe and, in accordance with such regulations, make appropriate changes in the eligibility determinations on the basis of such verification.

*codified* at 42 U.S.C. § 1758(b)(2)(C).

On May 25, 1982, USDA issued proposed rules governing the revised application procedures for the NSLP. 47 Fed.Reg. 22704 *et seq.* This proposal was designed to implement the verification provisions of Section 803 that do not have an immediate impact on the application process at the beginning of the school year. 22 Fed.Reg. 22708. Concurrently, USDA issued proposed "Verification of Eligibility" rules which would establish minimum standards for the verification of income on applications for free and reduced meals. 47 Fed. Reg. 22707. This proposal recommended that school districts, during the 1982–83 school years, conduct verification on a mini-

mum of three percent (3%) or 3000, whichever is less, of the applications on file by October 15, 1982. 22 Fed.Reg. 22708. The verification project was to be completed within 5 months from the start of the school year. On March 25, 1983 the Secretary promulgated an interim verification rule. 48 Fed.Reg. 12505 *et seq.* These regulations required that the 3 percent or 3000 level (whichever is less) of verification be completed for the current 1983–84 school year. The primary source of information is evidence, such as pay stubs or letters from employers. 7 C.F.R. § 245.-6a(b)(1). If the documentation submitted by the household is insufficient to confirm eligibility, the school may ask the family to authorize a collateral contact with another party. If the household refuses to designate a collateral contact, the household is subject to termination of benefits. 7 C.F.R. § 245.6a(b)(2). If a school determines through the verification process that a household is not eligible for the program benefits, the school must provide notice to the household of the school's intent to reduce or terminate benefits. 7 C.F.R. § 245.6a(e). If the household appeals the school's determination within 10 days after the notice is sent, the household will receive continued benefits while pursuing the appeal. 7 C.F.R. § 245.7(b).

Plaintiffs attack these regulations on three fronts; they urge that by issuing these regulations the Secretary has breached his duty under the National School Lunch Act, and violated several requirements of the Administrative Procedure Act and the Regulatory Flexibility Act. Plaintiffs allege that by issuing these binding interim verification regulations, which will affect students and school systems nationwide, before completing the required pilot study, the Secretary of Agriculture has breached his duty under 42 U.S.C. § 1758 *note.* Plaintiffs assert that because the pilot study which Congress required or any study addressing the cost effectiveness of imposing these verification procedures, was not used as the basis for the interim regulations, the Secretary's action constitutes an arbitrary and capricious action within

the meaning of 5 U.S.C. § 706(2)(A). Plaintiffs assert that compliance with the verification regulations will disrupt and impair program operations and may discourage participation in the program. (Complaint, ¶¶ 11–26.) They contend that the Secretary failed to adequately address the comments which questioned the need for a cost-benefit analysis before imposing the regulations and thereby violated 5 U.S.C. § 553(c). Finally, they allege that the Secretary has violated the Regulatory Flexibility Act, 5 U.S.C. § 603(a), by certifying in the verification regulations that they would not be significantly burdensome on school officials.

Before addressing these allegations seriatim, the Court must consider whether these plaintiffs have standing to bring this suit and will address the issue of class certification.

## I. STANDING

Three of the four individual plaintiffs have children who participate in local school meals programs under the NSLP and have expressed a concern over the possible embarrassment which will be caused them if an employer is contacted to verify financial data. They are also concerned about the general disruptive effect which the conduct of the program will have without the benefit of the pilot study. The fourth individual plaintiff brings this action on behalf of her constituents, the 600,000 low-income families of New York City who receive free and reduced-price meals through the program. Five school district plaintiffs, who are responsible for administering the school lunch program for their respective cities, allege that the new verification procedures will result in additional expenditures of staff time and resources and that eligible children may be driven from the program as a result of the verification requirements. The National Anti-Hunger Coalition (NAHC) is an unincorporated association consisting of recipient membership organizations whose members are eligible for federal food program benefits and advocacy organizations which re-present recipients on food and nutrition issues. They claim that their recipient membership who participate in the NSLP are threatened with being subjected to untested and burdensome verification procedures before the pilot study is completed.

In *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the Supreme Court summarized the requirements for standing. "At an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Id.* at 472, 102 S.Ct. at 758 (citations omitted). The standard which plaintiffs must meet was recently set forth by the Court of Appeals for this Circuit in *Capital Legal Foundation v. Commodity Credit Corp.*, 711 F.2d 253 (D.C.Cir.1983). In that case the court found,

> The standing inquiry focuses on the substance of the agency action, its adverse impact on the plaintiff, and the types of interests that the applicable law is designed to protect. The would-be plaintiff's interest in the relevant law is ascertained by injury in fact; the law's interest in the would-be plaintiff is determined by the "zone of interests" test. Mutuality of interest must be credibly asserted.

*Id.* at 259; *accord Gull Airborne Instruments v. Weinberger*, 694 F.2d 838 (D.C. Cir.1982). The Court concludes, based on these criteria that all plaintiffs have standing to challenge the Secretary's issuance of these regulations. The individual plaintiffs whose children have benefited from the school lunch program suffer threatened injury if they are required to submit to the verification process. The plaintiff school districts and the individual administrator will be the conduits for implementing the verification programs and thus must bear

the additional costs inherent in complying.[2] Finally, the NAHC has alleged that member recipients will be subjected to the verification requirements. The Court finds that these plaintiffs have standing to challenge these verification requirements since they have alleged the adverse impact they would have on their various interests in the administration of the NSLP. These plaintiffs are within the "zone of interests" to be protected by the NSLP—that of providing a nutritional meal to needy children at no-cost or reduced cost by administrators who run the program from the same fund used to subsidize the meals.[3] The Court understands that the action challenged is the issuance of the verification regulations without the guidance of a pilot study and not to verification in itself. This distinction does not warrant finding that the plaintiffs lack standing to bring this suit. Were the Court to grant the relief plaintiffs seek, their injury would be redressed in the sense that they would be excused from complying with a scheme which might be implemented at reduced cost and disruption.

## II.   CLASS ACTION

■ The complaint properly sets forth class action allegations under the local rules. While the plaintiffs have not moved for class certification and under the rules their time for doing so has not elapsed, the Court finds that class certification is unnecessary in this action since the defendants are government officials and the declaratory and injunctive relief sought by the named plaintiffs would benefit all proposed class members. There is no need, therefore, to have this case proceed at this juncture as a class action. *See Ihrke v. Northern States Power Company,* 459 F.2d 566, 572 (8th Cir.1972), *vacated as moot,* 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72 (1972);

**2.** While defendants assert that the States may assume these costs and thus lighten the burden on the school districts themselves, it was noted at oral argument that only one State, Maine, has done so. Thus, it appears that the school districts will actually be bearing the costs.

*Berlin Democratic Club v. Rumsfeld,* 410 F.Supp. 144, 163–64 (D.D.C.1976).

## THE SECRETARY'S DUTY UNDER NSLA

The regulations implementing the statute provide for verification to be conducted during both the 1982–83 and 1983–84 school years. The OBRA amendments to the NSLP require, as well, that a pilot study be undertaken. The amendments and the regulations implementing them do not specifically require that a pilot study is to be required during either year or as a condition precedent to undertaking verification efforts.

Plaintiffs assert that the Secretary's decision to implement the verification requirements before conducting a pilot study of their cost-effectiveness and burden does not merit this Court's deference. The rationale of plaintiffs' complaint is that the goal of discouraging fraud and waste will not be furthered if the costs and burden involved in verifying participants' eligibility is greater than the money to be saved by ensuring that only eligible children participate in the program. *See e.g.,* affidavit of Elizabeth Cagan, ¶¶ 15–16 (attached to Plaintiffs' Cross-Motion for Summary Judgment). Plaintiffs argue that the pilot study was required with this in mind. It is the plaintiffs' position that the government has the obligation to develop alternative verification methodologies, test them, compare their relative cost effectiveness and burden and provide such results in both the final pilot study report and in the proposed rulemaking. Plaintiffs assert that since the USDA is spending $1.5 million on that pilot study, the results of it should serve as a basis for any new verification system, if one is warranted, and not as an after-the-fact justification.

**3.** *See* Income Verification Pilot Project (IVPP), The Development of an Error-Prone Model for the School Meal Programs (Revised August, 1983), pp. 4–5, attached as Ex. C to Plaintiffs' Cross-Motion for Summary Judgment.

Defendants argue that the subsections of Section 803 concerning both the pilot study and the amendments to Section 9 concerning verification were made effective upon enactment of OBRA by Section 820(a)(7) of that legislation. 95 Stat. 534. Defendants assert that there is no evidence from the legislative history that Congress intended USDA to delay implementation of the Section 9 amendments until *after* the completion of a pilot study. Defendants further assert that the provision for the pilot study of verification techniques was not a centerpiece of the verification effort. They assert that it was only viewed as a tool in refining verification activities which otherwise would go forward as a result of the other OBRA amendments.

It is clear, however, that the Secretary has not ignored the requirement of a pilot study. It is proceeding in two phases; the first phase has been completed[4] and the report of the second phase will be ready in late 1983. (Declaration of George A. Braley, ¶¶ 23–24, attached to Defendant's Opposition to Motion for Preliminary Injunction.) The Secretary has interpreted the statute to allow the income verification scheme to proceed while Part II of the pilot study is completed. Since the statute is silent concerning the precise timing of the study and the Secretary has decided that verification efforts and the pilot study could proceed simultaneously, the Court must focus on whether the Secretary's decision is an abuse of discretion. *Cf. Ambach v. Bell,* 686 F.2d 974, 981 (D.C.Cir. 1982).

■ Because the standard for review of the Secretary's decision is deferential, it must be affirmed if it has a rational basis and was made after consideration of relevant factors. *Ethyl Corp. v. EPA,* 541 F.2d 1 (D.C.Cir.1976), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park, Inc. v.*

*Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ In support of their respective positions, defendants emphasize the cost-saving purposes of OBRA while the plaintiffs rely·on the policy of establishing, maintaining and expanding non-profit school lunch programs expressed in the National School Lunch Program. In reviewing the Secretary's decision, the Court must consider both statutes. It must ensure that the Secretary considered the purposes of the NSLP, which he is charged with administering, as well as the more recent responsibilities given him in carrying out OBRA. *See Turner v. Prod,* 707 F.2d 1109, 1121 (9th Cir.1983) (analyzing effect of OBRA on the eligibility under the Aid to Families with Dependent Children Program). A decision which furthered one statute while abandoning the other would be an abuse of discretion. When the Court is asked to review an agency official's promulgation of rules based on an interpretation of a statute, it must consider the plain meaning of the statutory language, examine the legislative history for evidence that Congress intended the statute to have a different meaning and consider the policy argument in favor of a less literal reading of the act. *Mohasco Corp. v. Silver,* 447 U.S. 807, 815, 100 S.Ct. 2486, 2491, 65 L.Ed.2d 532 (1980). The Court must also consider whether the rule promulgated is in harmony with the statute. *See United States v. Larionoff,* 431 U.S. 864, 873 n. 12, 97 S.Ct. 2150, 2156 n. 12, 53 L.Ed.2d 48 (1977), *citing Manhattan General Equipment Co. v. Com'r,* 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1936).

■ The Court finds that the rules promulgated to implement OBRA were fully consistent with OBRA's statutory mandates and its legislative history and that they evince, as well, that the Secretary has not relegated his duties under the NSLP. As the Court has explained, the OBRA amendments to the NSLA provided both for the Secretary to verify the eligibility of

---

**4.** *See* Income Verification Pilot Project, 1981–1982 School Year, Exhibits A–D, attached to Plaintiffs' Cross-Motion for Summary Judgment.

recipients and to conduct a pilot study to perfect the techniques used to do that. Since the statute does not provide that one is to be a pre-condition for the other, the Court has considered the legislative history. The Senate Report of OBRA explains,

> During May of 1980, USDA's Office of the Inspector General (OIG) conducted an audit of free and reduced-price lunch applications in 220 randomly selected public and private schools. The results of that audit indicated that close to 30 percent of all approved applications contained incorrect income or household information which resulted in applicants receiving benefits to which they were not entitled. OIG projects that such an error rate may have cost the Federal Government as much as $171.5 million for the 1979/1980 school year.
>
> Current law allows local school authorities to verify data submitted on free and reduced-price meal applications only "for cause." "Cause" has at best been difficult to define. In its February 1981 report on the May audit, OIG recommended that the data submitted on free and reduced-price lunch applications be verified:
>
> > We believe our review shows the need for verification and that the pilot projects, while they may be helpful in working out the mechanics for verifying the information, are not necessary to justify the need to verify, at least income.

S.Rep. No. 97–139 at p. 77; 2 U.S.Code Cong. & Admin.News at 396, 466.

Congress was satisfied in 1981 when it passed the OBRA amendments to the NSLP that there existed a need for verification to ensure the commencement of cost-savings and eventual cost-savings to the government. The purpose of OBRA, as a whole, was to "bring the rapid growth of Federal spending under control and move toward a balanced Federal budget." "Views of the Committee on the Budget," S.Rep. No. 97–139 at p. 13; *Turner v. Prod,* 707 F.2d at 1111. The Committee on the Budget further explained,

> The total savings reported by all Senate committees fall $1.7 billion short of the total reconciliation savings in fiscal year 1984 outlays specified in the First Budget Resolution.
>
> Spending decisions about future years can and must be made as early as possible. To the extent that Congress fails to make these decisions today, the likelihood of achieving these savings tomorrow decreases.

The Court is not persuaded to the contrary by plaintiffs' argument that in 1980 Senator Boren had indicated his concern as to whether fraud or misreporting actually existed in the school lunch program and had proposed that a pilot study be completed to determine its extent. Senator Boren's comments were made when Congress was initially considering legislative efforts in this area in connection with his proposed amendment which was not enacted. By 1981, the extent of misreporting had been documented in an OIG study and the Senate report concerning the amendments enacted provides,

> In line with OIG's recommendations, the Committee would both allow States and local school authorities to seek verification of the data on free and reduced-price meal applications, as well as require States and local school authorities to undertake such verification *as the Secretary may by regulation prescribe.*

S.Rep. No. 97–139, *supra,* at p. 78, U.S. Code Cong. & Admin.News 1981, p. 467.

■ The regulations prescribed by the Secretary provide for mandatory verification; in addition, a pilot study is also being completed. The Secretary's decision that the purpose of OBRA, to effect cost-savings in programs he administers, was sufficiently compelling so that verification efforts should begin promptly rather than being further delayed by another year or two years is one which the Court finds to be fully in harmony with the statute, the legislative history and the policy of OBRA as it amended the NSLA.

A review of the regulations prescribed makes clear that the Secretary was aware

of the burden which verification would impose on the officials administering the program. The verification scheme is not detailed and elaborate; it requires that 3% or 3000 of the applications, whichever is less, to be verified and allows the schools to choose among a number of verification methods. (Declaration of George Braley, "Braley Decl.," ¶ 25). In view of the evidence of abuses in the free and reduced price application process, USDA did not believe these to be excessive requirements. (Braley Decl., ¶ 16.) The Secretary was also concerned that benefits were delivered to needy children consistent with the purposes of the NSLP. In the event that as a result of the verification program a household is found ineligible to receive benefits, the regulations allow a household to appeal and continue to receive benefits while pursuing the appeal. (Braley Decl., ¶ 11.) The Court agrees that the regulations were developed to strike a balance between the Congressionally mandated improvement of accountability in the school meals program as reflected by P.L. 97–35 and the need to assure delivery of benefits to needy children, while imposing as few requirements as possible on parents and school officials. (Braley Decl., ¶ 12.)

In light of the standard for review of the Secretary's regulations, the Court concludes that they are fully consistent with the statutory directives and purposes of OBRA and the NSLP and were developed with a view to imposing minimal disruption and expense.

### REVIEW OF USDA COMPLIANCE WITH 5 U.S.C. § 553

Plaintiffs assert that the Secretary's rule-making must be set aside because it was implemented without the benefit of a completed pilot study and thus failed to consider all relevant matter. They further argue that the Secretary failed to address significant issues raised by the comments to the May 25, 1982 proposed rules and

that his explanation for his promulgation of the rule was so obtuse that meaningful public comment, to which the agency might have paid greater attention, was precluded. In support of the latter claim, plaintiffs assert that of the 15,600 school districts which will experience administrative burdens as a result of the regulations, only 192 comments were filed.[5]

The Court rejects plaintiffs' assertion that the proposed rule-making failed to explain the legal authority under which it was proposed and the substance of the subject and issues involved under 5 U.S.C. § 553(b). The May 25, 1982 "Revised Application Procedures" set forth the relevant provisions of the NSLA before amendment, explained the changes that P.L. 97–35 would have upon the Act and summarized the effect they would have on the operation of the program. 47 Fed.Reg. 22704–22707. Similarly, with respect to the "Verification of Eligibility" regulations, the March 25, 1982 regulation explained the purposes of the amendment and clearly set forth the 3% or 3,000 verification requirement. The May 25, 1983 proposal also set forth the actual terms of the regulation. *See* 47 Fed.Reg. 22709–20710. Thus, the Court cannot agree that either proposed regulation was so unclear that public comment was precluded.

Plaintiffs argue that the Secretary failed to respond in the May 25, 1983 issuance to those comments that were made. An agency is not required to respond to every negative comment. *Continental Airlines v. CAB*, 551 F.2d 1293 (D.C.Cir. 1977). Rather, the statement of the basis for the regulation must show the Court what "major issues of policy were ventilated by the informal procedures and why the agency reacted to them as it did." *Automotive Parts and Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C.Cir.1968). Logically, it "is not in keeping with a rational process to leave vital questions raised by comments which are of cogent

---

**5.** The Secretary has stated that 211 comments were filed (Braley Decl. ¶ 5) 155 of these were

from school food authorities.

materiality, completely unanswered." *United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240, 252 (2d Cir.1977).

The interim rule promulgated by the Secretary on March 25, 1983 and published at 48 Fed.Reg. 12505 fully comports with the requirements set forth, *supra.* The Secretary responded to comments criticizing the timing of the interim rule since it would be effective before completion of the pilot study. The Secretary responded to the concerns expressed regarding the timing of the interim rule by *recommending* that the minimum standards be implemented for 1982–83 and *requiring* minimum verification standards for 1983–84. This schedule was deemed a good compromise since, "by postponing the verification requirement [for the 1982–83 school year], the Department will have the benefit of comments by school administrators who have gained operational expertise this school year." 48 Fed.Reg. 12505 (March 25, 1983). In response to 23 comments expressing concern as to whether sufficient fraudulent activity existed in the program to merit the requirements, the Secretary responded that, "[G]iven the OIG's evidence of Federal loss, the Department believes that sufficient cause exists to establish parameters for the verification of income eligibility information." 48 Fed.Reg. 12506. Additionally, in response to over 100 comments that require the school food authorities to carry out the plan would create an administrative burden and 32 comments specifically noting that the 3 percent or 3,000 level would be burdensome, the Secretary explained that he had initially considered requiring 10 percent of all applications to be verified. When the Secretary determined that this would indeed present a burden to the verifying officials, he

> initiated informal discussions with the Office of Management and Budget, the Department's Office of Inspector General, State agencies and Regional Offices as to what percentage of applications we could, at a minimum reasonably require to be verified. The proposed three percent or 3,000 (whichever is less) level represented the resultant compromise.

Since only 32 commentors stated that such a sample size would be administratively burdensome, the sample size has been retained for use next school year. 48 Fed.Reg. 12506–07.

■ The Court finds that the Secretary has responded to the major issues raised by the comments and has adequately explained his reaction to them in accordance with *Automotive Parts* and *Nova Scotia Food Products.*

■ In addition to challenging the Secretary's compliance with the procedural rule-making requirements, plaintiffs also assert that the verification regulations must be set aside as "arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). They make this assertion on two grounds: (1) that the verification requirements are burdensome and (2) that the verification requirements were imposed prior to the completion of the pilot study. In reviewing agency action under the "arbitrary and capricious" standard the Court must satisfy itself that the agency "has demonstrated a 'rational connection between the facts found and the choice made,'" *Wawszkiewicz v. Department of Treasury,* 670 F.2d 296, 303 (D.C.Cir.1981), citing, *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 (D.C.Cir.1977), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Under this standard, the Court cannot find that on either point the Secretary has abused his discretion. His decision to require the 3 percent or 3,000 level of verification was based upon the result of OIG study and his consideration that requiring a greater verification effort would be burdensome on the schools. His decision that verification was necessary tempered with a consideration of the effect on those who would verify demonstrates a rational response to the situation presented. Second, there is no indication that the Secretary will not use the results of the pilot study at all. As the parties agree, the interim regulations will remain in effect until USDA modifies them. The declaration of George

Braley indicates that both the experiences of the school officials and states implementing the program and the comments submitted before November 30, 1983 deadline will be extremely valuable in developing the final rule. (Braley Decl. ¶ 26.) Were the Secretary to have chosen to delay verification efforts until after the pilot study had been completed, mandatory verification could possibly have been postponed for another year. Based on the Secretary's analysis of the OIG study, he decided that verification efforts should go forward, albeit in a limited manner. As the Court has ruled, that was a rational choice upon consideration of the facts presented him. As the Court has earlier explained, neither the statute nor the legislative history mandates that the pilot study be finished before verification efforts begin. It is entirely within the Secretary's discretion to allow verification to go forward at a minimal level while gathering data that will aid in refining verification methods that will be implemented on a larger scale.

### REGULATORY FLEXIBILITY ACT

■ The plaintiffs assert that USDA has failed to comply with the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.* in promulgating the interim rules. The Court disagrees with defendants that it cannot review an agency's compliance with this Act. It does so based upon 5 U.S.C. § 611(b) which provides that "when an action for judicial review of a rule is instituted, any flexibility analysis for such rule shall constitute part of the whole record of agency action in connection with the review." In *Small Refiners' Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 539 (D.C.Cir.1983), the D.C. Circuit reviewed this section and concluded that an agency's flexibility analysis could not be reviewed by itself but that it could be reviewed in conjunction with a review of an agency's action as a whole and that a court could strike down a rule if it found a defect in the flexibility analysis. *Id.* at 539.

■ Defendants argue that these plaintiffs lack standing to challenge USDA's compliance with the RFA. While school districts are specifically mentioned as beneficiaries of the Regulatory Flexibility Act, 5 U.S.C. § 601(5), it limits the size of the school districts covered to those with populations of less than 50,000. The Court finds that since none of the major urban school district plaintiffs are covered by the statute that they lack standing to challenge the Secretary's compliance with this Act.

■ The Court, however, will review the Secretary's compliance with the Act. The Act provides that the analysis may be waived when "the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities," 5 U.S.C. § 605(b). The basis for the Secretary's decision on this issue is that there were anticipated "[n]o major increase in cost or prices for program participants, individual industries, federal, state or local government agencies or geographic regions." Although the basis for this conclusion could have in the Court's view been more fully documented, the Court cannot find that a review of the record of this rule-making as a whole contradicts that finding. The Secretary had expressed his concerns that verification not be unduly burdensome. As a result, the original verification requirement of 10 percent which had been considered was reduced to the lesser of three percent or 3000 applications. The Court is unwilling to find that the Secretary erred by deciding he need not undertake a flexibility analysis.

The Court is concerned about the inhibiting effect which verification may have on participation in the program. To the extent that plaintiffs are harmed by the absence of a statutory mandate that a pilot study be completed prior to the commencement of verification, their complaint may more appropriately be directed at Congress. Summary judgment will be entered for the defendants. An appropriate order accompanies this Memorandum Opinion.