**GLASS PACKAGING INSTITUTE,**
**et al., Appellants**

v.

**Donald T. REGAN, Secretary of the**
**Treasury, et al.**

No. 83–1390.

United States Court of Appeals,
District of Columbia Circuit.

Argued 16 Nov. 1983.

Decided 8 June 1984.

As Amended July 6, 1984.

Michael S. Kelley, Washington, D.C., with whom Miles W. Kirkpatrick, Caswell O. Hobbs, III, Janine Sweeney Frias and Scott Stempel, Washington, D.C., were on the brief for appellants. Howard T. Weir, Washington, D.C., also entered an appearance.

Joseph W. LoBue, Asst. U.S. Atty., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Michael J. Ryan, Asst. U.S. Attys., and Robert M. Tobias, Atty., Bureau of Alcohol, Tobacco and Firearms, Washington, .D.C., were on the brief, for appellees Regan, Secretary of Treasury, et al. Lee S. Strickland, Asst. U.S. Atty., Washington, D.C., also entered an appearance.

Jerome H. Heckman, Washington, D.C., with whom John B. Dubeck, Peter L. de la Cruz and Ilene R. Heller, Washington, D.C., were on the brief for appellee Society of Plastics Industry, Inc.

---

1. 21 U.S.C. § 348 (1982).

Before WILKEY and GINSBURG, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

The Glass Packaging Institute, a trade association of glass bottle manufacturers, and its president, William W. Sadd, brought this suit to block a decision by the Bureau of Alcohol, Tobacco and Firearms permitting liquor to be packaged and sold in plastic polyethylene terephthalate bottles. The plaintiffs argue that this administrative ruling is unlawful because it was promulgated without notice and comment. They also assert that the risk of criminal tampering with polyethylene terephthalate bottles should have been considered in the environmental assessment prepared by the agency. The district court rejected both these claims. We affirm the district court's decision, concluding that plaintiffs lack standing to challenge alleged procedural deficiencies in the administrative process, and that the agency's environmental assessment was not defective.

## I. BACKGROUND

### A. *Statutory Scheme*

The types of materials that may be used to package alcoholic beverages are regulated by two federal agencies, the Food and Drug Administration ("FDA") and the Bureau of Alcohol, Tobacco and Firearms ("Bureau"). Although these agencies serve diverse statutory goals, their respective regulatory domains partially overlap. Consequently, bottlers of alcoholic beverages must comply with the dual sets of regulations promulgated by these agencies.

The FDA is charged with the primary responsibility of safeguarding the lives and health of consumers of food and drugs. The Federal Food, Drug, and Cosmetic Act prohibits the use of a "food additive" unless that use conforms to FDA regulations.[1] Alcoholic beverages are foods,[2] and

2. "The term 'food' means (1) articles used for food or drink for man or other animals ...." *Id.* § 321(f).

liquor bottles are considered additives[3] under the definitional sections of this Act. Consequently, distillers wishing to bottle alcoholic beverages using a packaging material not currently on the market must seek FDA approval before using the new substance.

This process is usually commenced by filing a food additive petition with the FDA, which then publishes a notice in the Federal Register. After evaluating the potential impact on the public health and safety of the use of the proposed substance, as well as considering the accompanying environmental effects, the petition is either granted or denied. Approval of the petition is usually effectuated by an amendment to the FDA's food additive regulations permitting anyone to use the newly approved packaging material subject to any limitations or guidelines contained in the amended regulations.[4]

The second series of regulations governing the packaging of alcoholic beverages exists to regulate tax revenues. The United States levies a tax on each gallon of distilled spirits produced in or imported into the United States, based on the volume of alcohol contained in the beverage.[5] The Secretary of the Treasury is charged with the responsibility of collecting these revenues. Because the integrity of the packaging materials can have a direct effect on the volume of alcohol and, consequently, the amount of tax to be collected, the use and refilling of liquor bottles are strictly regulated.[6] Under authority delegated by the Secretary of the Treasury,[7] "whenever in [its] judgment such action is necessary to protect the revenue," the Bureau is authorized (1) "to regulate the kind, size, branding, marking, sale, resale, possession,

use, and reuse of containers ... designed or intended for use for the sale of distilled spirits," and (2) to require persons manufacturing these containers to submit to inspections, to keep records, and to file reports as prescribed by the Bureau regulations.[8] Regulations promulgated by the Bureau pursuant to this authorization require that containers used for liquor bottles be made from materials which it has approved as adequately protecting tax revenues.

## B. Current Controversy

In 1973, after notice and comment rulemaking proceedings, the FDA approved the use of polyethylene terephthalate plastic in containers used for alcoholic beverages not exceeding fifty percent alcohol by volume. These beverages include beer, wine, and many liquors falling within the Bureau definition of distilled spirits.[9] Anticipating that several distillers might eventually request clearance to use this type of plastic in packaging distilled spirits, in 1976 the Bureau issued an industry circular notifying proprietors of distilled spirits plants of the procedures to be followed to obtain authorization to use new plastic compounds in liquor bottles. These steps included submitting sample bottles for use in Bureau testing, and providing verification that the plastic packaging compound meets all applicable FDA requirements for packaging alcoholic beverages.[10] The Bureau also noted in this circular that the National Environmental Policy Act would require the Bureau to prepare a study of possible environmental effects caused by use of the proposed plastic packaging material.

---

3. "The term 'food additive' means any substance ... intended for use in ... packaging, transporting, or holding food ...." *Id.* § 321(s).

4. *See generally* Brief for Federal Appellees at 1–2; Brief for Intervenor-Defendant Appellee the Society of the Plastics Industry, Inc. at 4–5, 17–18.

5. *See* 26 U.S.C. § 5001(a)(1) (1982).

6. *Id.* § 5301(c).

7. 37 Fed.Reg. 11,696 (10 June 1972).

8. *See* 26 U.S.C. § 5301(a) (1982).

9. *See id.* § 5002(a)(8).

10. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, *Industry Circular*, No. 76–19, 25 August 1976, §§ 3.1, 3.2, 4.02, *reprinted at* Joint Appendix ("J.A.") 45–46.

Apparently no formal distillers' applications to use polyethylene terephthalate plastics were filed until 27 October 1980 and 26 October 1981. On these dates two distillers requested Bureau clearance to use polyethylene terephthalate ("PET") in packaging their distilled spirits. On 8 June 1981, the Glass Packaging Institute ("GPI") requested that the Bureau conduct an informal rulemaking on the issue of whether the Bureau's regulations should be amended to embrace PET liquor bottles.

No rulemaking proceeding was initiated in response to GPI's request. However, on 11 January 1982 the Bureau notified the public of its intent to prepare an environmental assessment on the use of PET in liquor bottles. GPI filed comments, urging that the manufacturing of PET containers would consume too much energy, that the use of PET in packaging could be carcinogenic, that incineration of discarded PET bottles would release harmful gases, and that disposal of solid wastes would present additional environmental hazards. These and other environmental objections were taken under advisement by the FDA. Well after the close of the period for filing written comments, and only approximately two weeks before the initial environmental evaluation was due to be released, GPI also sought to notify the Bureau about the environmental threat posed by the alleged tamperability of PET bottles. This concern was prompted by nationally publicized news stories about unrelated incidents of tampering with nonprescription pain medicines. GPI's attempts to schedule a meeting with the Bureau on the issue of PET tamperability were unsuccessful.

On 5 October 1982, without specifically mentioning the two pending requests for PET clearance, the Bureau issued a final rule effective 5 November 1982 amending its definition of a permissible liquor bottle. The previous definition permitted distillers to use liquor bottles made of "glass, or

earthenware, or other suitable material approved by the Director [of the Bureau]."[11] The new regulation authorized liquor bottles "made of glass or earthenware, or of other suitable material approved *by the Food and Drug Administration* ... and which has been determined by the Director [of the Bureau] to adequately protect the revenue."[12] The rule codified the Bureau's longstanding practice of deferring to FDA expertise on the health and safety issues associated with approval of new packaging materials.[13]

Because the FDA had previously approved PET for use in liquor bottles, the final rule arguably permitted distillers to begin manufacturing PET liquor bottles subject to FDA regulations. However, at this point, the Bureau had not ruled on whether PET would adequately protect tax revenues. Neither had a final environmental assessment been issued.

One day before the final rule was to become effective GPI filed suit in the United States District Court seeking to enjoin the Bureau from approving PET liquor bottles. GPI initially sought to overturn the approval of PET on three grounds. First, it contended that the Bureau's failure to conduct an informal rulemaking proceeding before approving PET liquor bottles violated the Administrative Procedure Act. Second, it charged that the Bureau's failure to prepare an environmental impact statement was inconsistent with the National Environmental Policy Act. Finally, GPI asserted that the Bureau had violated its own regulations by failing to determine whether PET would adequately protect revenue. The plaintiffs' motion for a temporary restraining order based on these grounds was denied on 4 November 1982.

On 4 November 1982 the Bureau released a final environmental assessment which concluded that use of PET liquor bottles would not have a significant envi-

---

**11.** *See* 26 C.F.R. § 175.17 (Revised, 1955); J.A. 104; Brief for Federal Appellees at 2.

**12.** *See* 47 Fed.Reg. 43,947 (1982), codified at 27 C.F.R. § 19.11 (1983) (emphasis added).

**13.** 47 Fed.Reg. 43,946 (1982); J.A. 66.

ronmental effect. That assessment did not discuss the susceptibility of PET bottles to criminal tampering. Later in November 1982, the Bureau also issued a ruling that use of PET liquor bottles would not adversely affect revenue collection, and could lawfully be used to package distilled spirits.[14]

On 28 February 1983, in response to the defendants' motion for summary judgment, United States District Judge Norma Holloway Johnson dismissed the plaintiffs' suit. The district court ruled that subsequent to the filing of the suit the agency properly concluded that PET would protect revenues, a point which GPI conceded.[15] The court also held that the Bureau had acted lawfully under the National Environmental Policy Act when it determined that an environmental impact statement was unnecessary. Finally, the court rejected the claim that an informal rulemaking was required by the Administrative Procedure Act, holding that the approval of PET was merely an interpretive rule, exempt from notice and comment rulemaking.[16] GPI then brought this appeal, contending that the court erred in its treatment of the environmental and procedural issues.

## II. Discussion

### A. *Procedural Claim*

Plaintiffs argue that the Bureau's amendment of its regulations to permit the packaging of distilled spirits in PET containers constitutes a substantive rule. They allege that the agency's failure to conduct notice and comment procedures before promulgating that rule allegedly violates Section 4 of the Administrative Procedure Act.[17] However, before we reach the merits of these contentions we must consider the plaintiffs' standing to raise this issue.

■ The exercise of judicial power under Article III is subject to several preconditions which, under the rubric of standing, help assure that the Judicial Branch fills its proper role under the tripartite system of powers envisioned under the Constitution. Among these preconditions, the Supreme Court has articulated several irreducible constitutional requirements which a plaintiff must meet before he is entitled to obtain relief in federal courts. All plaintiffs must demonstrate an actual or threatened injury caused by the allegedly illegal conduct of the defendant which can be fairly traced to the challenged action, and which is likely to be redressed by a favorable decision.[18] In addition to these constitutional requirements, several prudential principles also caution against exercise of judicial power.[19] Thus, the Supreme Court has generally required that a plaintiff's alleged injury at least arguably fall "within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."[20] Unless these constitutional and prudential standing requirements are satisfied by GPI or William W. Sadd we may not reach the merits of their claims.

■ The injury allegedly caused by the challenged approval of PET liquor bottles is the potential loss of revenues from the production and sale of glass liquor bottles which would occur if PET liquor bottles are allowed to compete in the liquor bottle mar-

**14.** *See* Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, *Industry Circular,* No. 82–14, 22 Nov. 1982, *reprinted at* J.A. 209.

**15.** J.A. 254–55.

**16.** J.A. 258.

**17.** 5 U.S.C. § 553 (1982).

**18.** *See Valley Forge Christian College v. Americans United for Separation of Church and State,* *Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

**19.** *Id.* at 475, 102 S.Ct. at 760; *American Friends Service Comm. v. Webster,* 720 F.2d 29, 51 (D.C. Cir.1983).

**20.** *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982) (quoting *Association of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)).

ket.[21] This is clearly a concrete, individualized injury which is directly attributable to the Bureau's approval of PET liquor bottles. Because distillers are unable to use PET packaging in the absence of Bureau approval, invalidation of the challenged regulations would avert the threatened injury. Thus, the district court correctly held that the constitutionally-grounded standing requirements are satisfied by plaintiffs' allegations.

However, neither the district court nor the parties below gave much consideration to whether the injury alleged as the basis for plaintiffs' procedural claim satisfies the zone of interests requirement. This omission is critical, since the zone of interests test implicates many of the same policies which underlie the constitutional standing requirements.[22]

◼ The zone of interests test is the element of standing which focuses on the relationship between the statute on which the claim is based and the alleged injury.[23] As we explained in *Copper & Brass Fabricators Council, Inc. v. Department of the Treasury*, this test "requires some indicia—however slight—that the litigant before the court was intended to be protected, benefitted or regulated by the statute under which suit is brought."[24] Here, the statute GPI invokes is 26 U.S.C. § 5301(a). The interest advanced by the plaintiffs is "the right to market distilled beverage containers free of competition from containers approved in an illegal fashion."[25] Unless there is some indication that this competitive interest is one protected or regulated

under Section 5301(a), plaintiffs' claim cannot qualify under the zone of interests test.

Section 5301(a) states: *"Whenever in [its] judgment such action is necessary to protect the revenue*, the [Bureau] is authorized ... (1) to regulate the kind ... of containers ... intended for use for the sale of distilled spirits ... and (2) to require, of persons manufacturing ... such containers, the submission to ... inspection ...."[26] By its terms, this section does not directly authorize the Bureau to regulate competition among manufacturers of liquor bottles. Its sole objective is that of safeguarding the revenues derived from gallonage liquor taxes. The plaintiffs do not suggest that other interests are protected. Indeed, they admit that "Section 5301(a), in its entirety, *is a single statutory provision with a single purpose....* [T]he entire provision was drafted to enable the Secretary to 'protect the revenue.' "[27] The regulation of competition among liquor bottle manufacturers is simply not one of the direct statutory interests protected by the statute on which plaintiffs rely.

It is also clear that competition among container manufacturers, as such, is not an indirect statutory objective, since there is no relationship between *who* makes the bottles and the *amount* of revenues recovered. Plaintiffs have not argued that an adverse impact on one category of bottle manufacturers could negatively affect the total revenues raised. The Bureau's statutory obligation is to ensure that the physical integrity of the container adequately protects the taxable commodity, alcohol,

---

**21.** Amended Complaint for Declaratory and Injunctive Relief ¶ 33, J.A. 156.

**22.** *Compare Tax Analysts & Advocates v. Blumenthal*, 566 F.2d 130, 140 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978) (zone of interests test intended to assure congruence between exercise of judicial power and mandate of legislative branch) *with Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982) (prudential standing principles framed with a view to Article III policies, such as the balanced relationship between co-equal arms of Federal Government).

**23.** *See Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

**24.** 679 F.2d 951, 952 (D.C.Cir.1982).

**25.** Appellants' Supplemental Brief Addressing the Question of Standing at 11.

**26.** 26 U.S.C. § 5301(a) (1982).

**27.** Appellants' Supplemental Brief Addressing the Question of Standing at 6–7 n. 6.

from undue variation; it has no obligation to guarantee or regulate the financial or competitive status of the industries and companies which undertake to manufacture liquor bottles. The plaintiffs' asserted interest in protecting their competitive position from vitiation caused by the allegedly illegally authorized entry of other potential competitors falls well outside the zone of interests protected or regulated by Section 5301(a).

Plaintiffs have not identified an injury to any other interest which could come within the zone protected by this section.[28] In their brief on this issue they focus on the fact that as manufacturers of containers for distilled beverages, their products are regulated by the Bureau. However, our prior decisions make it clear that mere regulatory impact on a party's commercial interests causing a diminished competitive status does not satisfy the zone of interests test when that competitive status is not an interest arguably regulated by the statute forming the basis for the action.

We recently faced a similar situation in *Copper & Brass Fabricators Council, Inc. v. Department of the Treasury*,[29] which dealt with a challenge by a trade association of copper manufacturers to the Treasury Department's decision to decrease drastically the copper content of the penny, replacing it with zinc. The enabling statute authorized the Secretary of the Treasury "to prescribe the copper and zinc composition 'as he may deem appropriate' and as is 'necessary in order to assure an adequate supply of coins to meet national needs.' "[30] It was thus evident that there was no congressional interest to protect, benefit or regulate the copper fabricators.

Although the challenged agency action had an adverse regulatory impact on the copper fabricators, who lost to the newly favored zinc producers a substantial share of the government's coin metal purchases, the exercise of discretionary authority to reduce United States copper consumption for reasons totally unrelated to the competitive status of copper fabricators was insufficient to place the copper fabricators within the zone of regulated interests.

The similarities between *Copper & Brass Fabricators* and the instant case are striking. Here the Bureau has exercised its discretionary authority to permit use of a new class of distilled spirits packaging which protects tax revenue. GPI's position is thus analagous to that of the copper fabricators' trade association—it has potentially lost a share of its preexisting market. However, because the statutory parameters guiding the Bureau's exercise of regulatory authority are totally irrelevant to the competitive impact of the decision on those manufacturers selling the regulated substance, the plaintiffs fail to come within the zone of interests arguably protected, benefitted or regulated by Section 5301(a). GPI's injury, a potential loss of revenue due to increased competition from PET liquor bottles, plainly is not an interest which Congress authorized the Bureau to regulate or protect.

Our decision in *Control Data Corp. v. Baldrige*,[31] also demonstrates that the zone of interests test is not satisfied. In *Control Data* a group of automatic data processing equipment manufacturers challenged regulations promulgated by the Secretary of Commerce that established certain technical specifications to which auto-

---

**28.** At oral argument, plaintiffs asserted that their claim was related to the statutory interest in protecting revenue. This is belied by their failure to challenge on appeal the Bureau's ruling that PET packaging adequately protects tax revenues. Moreover, they have not alleged how any reduction in revenues could inflict upon them an injury distinct from the generalized harm suffered by all citizens when the flow of revenues to the Treasury is restricted. There is no universal standing to assert this type of generalized claim. *See Valley Forge Christian College v. Americans United For Separation of*

*Church and State, Inc.*, 454 U.S. 464, 473–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982); *Capital Legal Foundation v. Commodity Credit Corp.*, 711 F.2d 253, 260 (D.C.Cir.1983).

**29.** 679 F.2d 951 (D.C.Cir.1982).

**30.** *Id.* at 952 (quoting 31 U.S.C. § 317(b) (1976)).

**31.** 655 F.2d 283 (D.C.Cir.), *cert. denied*, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981).

matic data processing equipment had to conform in order to compete for government procurement contracts. Because the standards were similar to those then met by one segment of the industry, the remaining segment suffered a potentially severe injury to its competitive position since it would have been forced to spend large sums of money to modify its equipment specifications in order to continue to compete in the government data processing market. The statute under which the regulations were enacted specifically authorized the government to set uniform technical standards, and to increase competition among suppliers.

Nevertheless, we held that the plaintiffs' claim was not within the relevant zone of interests. It was not sufficient that the plaintiffs were regulated by the agency rules to the extent that they had to conform to the applicable technical specifications in order to compete in a particular market. Rather the plaintiffs were required to show that the interest allegedly injured—their competitive status as data processing equipment manufacturers—was an interest which Congress at least arguably had required the agency to protect or regulate. The statute authorized the agency to establish uniform technical specifications and promote industry competition, but only to the extent necessary to produce the lowest possible procurement prices for the United States Government.[32] The regulatory impact was only the means through which the single statutory end was promoted. Thus, there was no indication that Congress intended to place the plaintiffs within the zone of interests protected or regulated by the statute.

Like the manufacturers in *Control Data*, GPI has potentially suffered an injury to its competitive interests. The statute authorizing agency action indicates a congressional interest to regulate only a specific narrow governmental interest—protection of tax revenues—similar to the intent to reduce procurement costs in *Control Data*. Section 5301(a) is not a general mandate to monitor or protect the competitive status or financial health of the affected industry. Because there are no indicia that these competitive interests were to be regulated by the Bureau under Section 5301(a), the plaintiff's injury is not arguably within the zone of interests, as required by the Supreme Court.[33]

This result is consistent with the general guidelines established by our other cases discussing the zone of interests standard.[34] The plaintiffs have advanced no compelling reasons why this prudential standing barrier should be relaxed. Without disparaging the genuineness of GPI's attempt to rectify alleged procedural irregularities in the Bureau's rulemaking, the interest which propelled it into the courts, preservation of a de facto dominant market position, is simply not one which Section 5301(a) was intended to protect or regulate. In these circumstances we hold that the plaintiffs lack standing to challenge the procedural validity of the Bureau's decision to permit distillers to package distilled spirits in PET bottles.[35]

32. *Id.* at 295.

33. *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

34. *See, e.g., Tax Analysts & Advocates v. Blumenthal*, 566 F.2d 130, 143 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978) (domestic oil producers' competitive interests not protected under Internal Revenue Code); *Committee for Auto Responsibility v. Solomon*, 603 F.2d 992 (D.C.Cir.1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980) (injuries to health and environmental interests were not protected by legislation intended solely to improve government property procurement and administration). GPI's claim is unlike those where the protected interest allegedly injured was discernible from the relevant statute as a regulatory objective. *See Howes Leather Co. v. Carmen*, 680 F.2d 818, 820–21 (D.C.Cir.1982).

35. *Cf. Capital Legal Foundation v. Commodity Credit Corp.*, 711 F.2d 253 (D.C.Cir.1983) (organization which was denied opportunity to comment due to allegedly illegal administrative procedures was nevertheless outside relevant zone of interests).

## B. *Environmental Claim*

■ The National Environmental Policy Act ("NEPA") requires Federal agencies to compile a complete environmental impact statement ·on all "major Federal actions significantly affecting the quality of the human environment."[36] That report must consider, *inter alia,* the "environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented."[37]

In discharging this statutory responsibility the Bureau prepared an environmental assessment of its decision to permit the use of PET liquor bottles. The assessment considered written comments raised by plaintiffs and others in response to the agency's public solicitation of comments on the potential environmental effects associated with use of PET liquor bottles. It concluded that approval of PET liquor bottles would not cause a significant environmental effect, and that no environmental impact statement was necessary. The district court upheld the legality of the Bureau's decision not to file an environmental impact statement based on the factors it considered.

The plaintiffs have not appealed this finding.[38] Rather, they argue that the Bureau erred by failing to consider an entirely separate impact which plaintiffs neglected to bring to the Bureau's attention during the written comment process. Specifically, the plaintiffs claim that a· deranged criminal could inject poisons through the plastic walls of PET bottles, thus dangerously affecting human health. They suggest that the Bureau's omission to evaluate this alleged environmental effect was fatal to the Bureau's decision not to prepare an envi-

ronmental impact statement. The district court rejected this claim on the ground that the plaintiffs had failed to . bring it to the Bureau's attention before release of the environmental assessment.

We reject the plaintiffs' NEPA claim as specious. No cognizable *environmental* effect is implicated by the introduction of a new plastic container into the market place merely because it may be susceptible to tampering. The policies served by NEPA are too important to be diluted as plaintiffs would have us do.[39] The Supreme Court has cautioned that

> NEPA does not require the agency to assess *every* impact or effect of its proposed action, but only the ·impact or effect on the environment. If we were to seize the word "environmental" out of its context and give it the broadest possible definition, the words 'adverse environmental effects' might embrace virtually any consequence of a governmental action that someone thought "adverse."[40]

By claiming that injury caused by ingestion of criminally adulterated food is an adverse environmental impact, the plaintiffs offer a definition of environment even broader than that rejected by the Supreme Court, extending the scope of "environment" well beyond any reasonable interpretation of the "natural and physical environment"[41] encompassed under NEPA.

The plaintiffs contend that NEPA requires consideration of environmental effects caused by reasonably foreseeable criminal acts of third parties. However, mere foreseeability does not trigger a duty to consider an alleged environmental effect. The limits to which NEPA's causal chain may be stretched before breaking must be defined by the policies and legisla-

---

**36.** *See* 42 U.S.C. § 4332(2)(C) (1976).

**37.** *Id.* § 4332(2)(C)(i)–(ii).

**38.** The plaintiffs have standing to raise this issue since plaintiff William W. Sadd alleged that he may consume distilled spirits packaged in PET, potentially subjecting him to health injuries resulting from contaminated liquor in compromised PET bottles. That injury, if cogniza-

ble as an environmental effect, would fall within the zone of protected interests under NEPA.

**39.** *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 103 S.Ct. 1556, 1562, 75 L.Ed.2d 534 (1983).

**40.** *Id.* 103 S.Ct. at 1560.

**41.** 40 C.F.R. § 1508.14 (1983).

tive intent behind NEPA.[42] NEPA is meant to supplement federal agencies' other nonenvironmental objectives,[43] not to transplant specific regulatory burdens from those expert agencies otherwise authorized to redress specific nonenvironmental problems and pointlessly to reimpose those objectives on other unqualified agencies. In this case the FDA already has the specific statutory authority to address issues of tamperability. Several provisions of the Federal Food, Drug, and Cosmetic Act prohibit "adulteration" of food, which includes the addition of "any poisonous or deleterious substance which may render it injurious to health."[44] The Federal Anti-Tampering Act[45] makes it a federal crime to inject poison in foods. That Act specifically empowers the FDA to investigate violations of the Act involving products subject to FDA regulation,[46] such as liquor sold in PET bottles. In light of this specific congressionally conferred FDA mandate to control tampering with foods, drugs, and other consumer products, it would be absurd to hold that susceptibility to tampering is an environmental health risk which the Bureau and every other agency must consider in making an environmental assessment.

*Hanly v. Kleindienst*[47] is not to the contrary. This case and its progeny establish only that NEPA protects quality of life for city residents.[48] In *Hanly*, residents of a neighborhood objected to the concentrated criminal activity that could take place in the immediate vicinity of a new jail. There is no similarity between that drastic and localized change in a specific neighborhood locale, and the diffused, generalized health effects said to occur in this case, where millions of plastic food and drug containers are already marketed nationwide. We seriously doubt whether Congress fashioned NEPA as an administrative incarnation of the policeman's squad car, roving the streets in search of sporadic criminal activity which may occasionally occur in the aftermath of an agency action, there to arrest the criminal in the name of "environmental protection."

A decision that no significant environmental impact will occur is buttressed by the conformity of the proposed federal action to federal regulations governing other aspects of that action's interrelationship with the physical environment.[49] The FDA has previously rejected contentions that risk of tampering by injection through plastic-walled drug containers is significant.[50] Thus, the Bureau's failure to consider tamperability would not necessarily require compilation of an environmental impact statement.

■ Moreover, social side effects of agency action, standing alone, do not require development of an environmental impact statement. Applicable regulations state that

*economic or social effects are not intended by themselves to require preparation of an environmental impact statement.* When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will dis-

**42.** *Metropolitan Edison Co. v. People Against Nuclear Energy,* 103 S.Ct. at 1561 n. 7.

**43.** *See* 42 U.S.C. § 4335 (1976).

**44.** 21 U.S.C. § 331(b), (k) (1983).

**45.** 97 Stat. 831 (13 Oct. 1983).

**46.** *Id.* at 832; *see* 18 U.S.C.A. § 1365(f) (Supp. Pamphlet 1966–1983).

**47.** 471 F.2d 823, 834 (2d Cir.1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973). *See also Hanly v. Mitchell,* 460 F.2d 640,

647 (2d Cir.), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972).

**48.** *See Realty Income Trust, Inc. v. Eckerd,* 564 F.2d 447, 452 n. 10 (D.C.Cir.1977).

**49.** *See Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 861 (9th Cir.1982); *Maryland-National Capital Park & Planning Comm'n v. U.S. Postal Serv.,* 487 F.2d 1029, 1036–37 (D.C.Cir.1973).

**50.** *See* 48 Fed.Reg. 16,658, 16,662 (1982).

cuss all of these effects on the human environment.[51]

The Bureau has already ruled that the potential physical and natural consequences of PET approval, such as those raised by plaintiffs and others in their written comments, does not require an environmental impact statement. The plaintiffs do not now challenge the district court's unqualified approval of the Bureau's treatment of these points. Thus, even if, contrary to our holding, the possibility of such minor social side effects as criminal tampering activity could be considered environmental impacts, that possibility would not tip the scale to require preparation of an environmental impact statement.[52]

■ Finally, the untimely manner in which plaintiffs raised the issue of tamperability also precludes us from overturning the Bureau's decision not to file an impact statement. The plaintiffs made no attempt to raise this claim until the final weeks of October 1982, at least eight months after the written comment period had expired, and less than two weeks before the environmental assessment was to be released. Even then, the plaintiffs' efforts to inform the Bureau of these issues, which apparently took the form of attempts "to schedule a meeting,"[53] did not actually inform the Bureau of this risk. Consequently, the dis-

trict court found that the plaintiffs failed to raise the issue with the Bureau before release of the environmental assessment. On appeal, the plaintiffs have offered no factual basis on which to overturn this finding. Failure to raise the claim or to seek reconsideration of the environmental assessment precludes the plaintiffs from now raising the issue.[54]

The plaintiffs' only justification for their tardy attempts to notify the Bureau is that container tamperability could not reasonably have been anticipated prior to the close of the written comment period when tampering of other consumer products briefly became the focus of national publicity. We doubt that the unrelated, highly publicized incidents of tampering relied upon by the plaintiffs suddenly brought the tamperability of PET within the realm of realistically probable consequences. But even accepting this much, the plaintiffs' argument appears to be that the Bureau had a mandatory duty to supplement its environmental assessment. However, such a duty is triggered only when the available new information is significant.[55] Significance is based on a variety of factors including the empirical value of the new evidence and its potential effect on the agen-

---

**51.** 40 C.F.R. § 1508.14 (1983).

**52.** *See Como-Falcon Community Coalition, Inc. v. United States Dep't of Labor,* 609 F.2d 342, 345 (8th Cir.1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980); *Goodman Group, Inc. v. Dishroom,* 679 F.2d 182, 185 (9th Cir.1982); *Image of Greater San Antonio, Texas v. Brown,* 570 F.2d 517, 522 (5th Cir.1978); *National Ass'n of Government Employees v. Rumsfeld,* 413 F.Supp. 1224, 1230 (D.D.C.1976), *aff'd mem.,* 556 F.2d 76 (D.C.Cir.1977).

**53.** Brief for Appellants at 28.

**54.** *Recreational Vehicle Industry Ass'n v. EPA,* 653 F.2d 562, 573 (D.C.Cir.1981); *Portland Cement Ass'n v. Ruckelshaus,* 486 F.2d 375, 394 (D.C.Cir.1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). Cases cited by plaintiffs for the opposite proposition are readily distinguishable. Unlike *Athlone Industries, Inc. v. Consumer Product Safety Comm'n,* 707 F.2d 1485 (D.C.Cir.1983), exhaustion of ad-

ministrative remedies was not obviously futile and would have served several policies underlying the exhaustion doctrine, including granting the agency an opportunity to apply its expertise and discretion to GPI's admittedly novel claim. Dictum in *Izaak Walton League of Am. v. Marsh,* 655 F.2d 346, 369 n. 56 (D.C.Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981) does not even discuss the exhaustion doctrine. *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1384–85 (2d Cir.), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978) permitted new evidence to be considered when the necessity of presenting the evidence was not apparent until after release of the agency's environmental evaluation, and was necessary to rebut other agency findings in the environmental impact statement. In this case, the significance of tamperability, if relevant at all, was not dependent upon other previously undisclosed evaluations made in the environmental assessment.

**55.** *See Friends of the River v. Federal Energy Reg. Comm'n,* 720 F.2d 93, 109 (D.C.Cir.1983).

cy's other calculations.[56] Here, the generalized threat of tampering was of questionable value indeed. Although plastic containers had been marketed for years, the plaintiffs' concerns were not triggered by the release of a significant study on the occurrence of tampering with plastic beverage containers, but only by the weak anecdotal evidence that other consumer products are currently subject to tampering. This minimal information was offered only at the conclusion of the administrative process, when agency attention had certainly shifted from evaluation of comments to final preparation and drafting of the assessment. The Supreme Court has cautioned against upsetting well-considered agency decisions based on scanty new evidence of alleged problems, and our court has been careful to follow its warning:

> Administrative consideration of evidence ... always creates a gap between the time the record is closed and the time the administrative decision is promulgated [and, we might add, the time the decision is judicially reviewed].... If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.[57]

The plaintiffs' allegations of tamperability are neither substantially based, nor were they ever brought to the attention of the agency. The occurrence of unsimilar tampering incidents at the conclusion of the agency decision making process forms no basis for remanding this proceeding to the Bureau for supplementation of its environmental assessment.

### III. CONCLUSION

The Bureau of Alcohol, Tobacco and Firearms administratively cleared the packaging of distilled spirits in PET bottles after determining that PET packaging will adequately protect United States liquor tax revenues. In this appeal GPI does not object to this specific conclusion, but seeks instead to redress the potential injury to its competitive status by attacking the Bureau's decision, made without notice and comment, to amend its rules to require advance FDA approval of new packaging materials. However, GPI's competitive injury is totally dissimilar to the narrow zone of interests contemplated by the statute relied upon by GPI, which focuses on the protection of tax revenues and not the regulation of industry competition. That disjunction between injury and statutorily grounded zone of interests precludes GPI's standing to challenge the process adopted by the Bureau to amend its rules.

The plaintiffs' belated alternative attempt to attack the Bureau's decision as environmentally unsound based on purported new evidence of tampering is transparently flawed. Although tampering may pose a consumer health risk, it is definitely not an environmental consequence under any reasonable interpretation of the National Environmental Policy Act. Even if it were, the evidence of the harm was insubstantial, and never placed squarely before the agency.

The plaintiffs have advanced no legitimate grounds for interfering with the Bureau's exercise of its authority to permit distillers to package distilled spirits in PET bottles. The decision of the district court is

*Affirmed.*

---

**56.** *Id.*

**57.** *Id.* (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 554–55, 98 S.Ct. 1197, 1217–18, 55 L.Ed.2d 460 (1978)).