INTERNATIONAL LABOR RIGHTS
EDUCATION AND RESEARCH
FUND, et al., Appellants,

v.

George BUSH, in his Official Capacity
as President, et al., Appellees.

No. 90–5390.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 3, 1991.

Decided Jan. 31, 1992.

Terry Collinsworth, with whom Robert M. Weinberg and Deborah C. Malamud, were on the brief, for appellants.

Lowell V. Sturgill, Jr., Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Douglas N. Letter, Atty., Dept. of Justice, were on the brief, for appellees. Irene M. Solet, Atty., Dept. of Justice, also entered an appearance, for appellees.

Before MIKVA, Chief Judge,
SENTELLE and HENDERSON, Circuit Judges.

## ORDER

PER CURIAM.

This case was heard on an appeal from the United States District Court for the District of Columbia.

IT IS ORDERED that the judgment of the district court dismissing this action be affirmed for the separate reasons expressed in the accompanying concurring statements by Judge Sentelle and Judge Henderson. Chief Judge Mikva has filed a dissenting opinion.

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring:

The appellants brought this action seeking to compel enforcement of the "worker rights" provisions of the Generalized System of Preferences, 19 U.S.C. §§ 2461–66, (GSP). The district court dismissed the complaint, holding the appellants' claims were nonjusticiable. *International Labor Rights Educ. & Research Fund v. Bush,* 752 F.Supp. 495 (D.D.C.1990). I would affirm the district court's dismissal on the ground that the district court lacked subject matter jurisdiction. Before the final order of dismissal, the district court denied a motion by the appellees to dismiss for want of jurisdiction. *International Labor Rights Educ. & Research Fund v. Bush,* 752 F.Supp. 490 (D.D.C.1990). Although the appellees did not appeal that decision and neither party has raised the jurisdictional issue here, this court is bound to consider it *sua sponte. See Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986) ("every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it") (quoting *Mitchell v. Maurer,* 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934)); *Citizens for the Abatement of Aircraft Noise, Inc. v. Metropolitan Wash. Airports Auth.,* 917 F.2d 48, 53 (D.C.Cir.1990) ("it is well established that a

court of appeals must first satisfy itself of its own jurisdiction, *sua sponte* if necessary, before proceeding to the merits"), *aff'd,* — U.S. ——, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991). For the following reasons I conclude that the subject matter of this action is within the exclusive jurisdiction of the Court of International Trade and that therefore neither the district court nor this court may properly exercise jurisdiction.[1]

The GSP authorizes the President to "provide duty-free treatment for any eligible article from any beneficiary developing country." 19 U.S.C. § 2461. The GSP further identifies beneficiary developing countries as those which the President has so designated pursuant to various statutory criteria. 19 U.S.C. § 2462. In 1985, Congress amended the GSP to add the worker rights provisions which require the President to deny beneficiary developing country status to any country which has not made some effort to extend employment rights to workers. *See* 19 U.S.C. § 2462(b)(7) ("the President shall not designate any country a beneficiary developing country under this section ... if such country has not taken or is not taking steps to afford internationally recognized worker rights to workers in the country (including any designated zone in that country)"); 19 U.S.C. § 2462(c)(7) (directing the President, "[i]n determining whether to designate any country a beneficiary developing country," to "take into account ... whether or not such country has taken or is taking steps to afford to workers in that country (including any designated zone in that country) internationally recognized worker rights"); 19 U.S.C. § 2464(c)(2)(A) (requiring the President to "conduct a general review of eligible articles based on the considerations described in section 2461 or 2462(c) of this title" no later than January 4, 1987); 19 U.S.C. § 2464(b) ("[t]he President shall, after complying with the requirements of section 2462(a)(2) of this title, withdraw or suspend the designation of

---

1. Exclusive jurisdiction of an appeal from a final decision of the Court of International Trade lies with the United States Court of Appeals for the Federal Circuit. 28 U.S.C. § 1295(a)(5).

any country as a beneficiary developing country if, after such designation, he determines that as the result of changed circumstances such country would be barred from designation as a beneficiary developing country under section 2462(b) of this title").

The appellants' complaint charged the appellees with failing to enforce the worker rights provisions and sought to compel enforcement. The appellees moved to dismiss the complaint for lack of jurisdiction based on 28 U.S.C. § 1581(i)(2), which grants the Court of International Trade "exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for ... (2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." The district court rejected the appellees' argument, reasoning:

> [T]his action does not appear to arise out of a law of the United States "providing for ... tariffs, duties, fees or other taxes on the importation of merchandise" within the meaning of 28 U.S.C. § 1581(i)(2). The GSP authorizes the President to grant duty-free status to goods from "beneficiary developing countries," 19 U.S.C. § 2461, and to withdraw, suspend or limit that status. 19 U.S.C. § 2464. These provisions do not constitute a law "providing for" tariffs, duties, fees or other taxes; they create conditions under which duties can be lifted or re-imposed, but these duties are "provided for," i.e. furnished or supplied, *see* The American Heritage Dictionary of the English Language 1053 (1981), not by the GSP but by other statutes. Indeed, the GSP provision governing withdrawal, suspension or limitation from the program specifically states that "no rate of duty may be established in respect of any article pursuant to this section other than the rate that would apply but for this subchapter." 19 U.S.C. § 2464(a)(1).

752 F.Supp. at 491–92. I disagree with the district court's analysis for the following reasons.

First, even under the district court's narrow construction of the statutory language, I believe section 1581 is one "providing for" duties insofar as it permits the President to deny, suspend or revoke beneficiary developing country status and thereby impose, at least indirectly, import duties. Moreover, the GSP was enacted as part of the Trade Act of 1974, 19 U.S.C. §§ 2101–2487, which expressly provides for adjustment of duty rates by the President. In any event, I find the district court's construction overly restrictive. The phrase "providing for" has a broader meaning than the simple verb "provide" and can be construed to mean "relating to," as the Supreme Court has done in considering this very provision. *See K Mart Corp v. Cartier, Inc.*, 485 U.S. 176, 188, 108 S.Ct. 950, 959, 99 L.Ed.2d 151 (1988) ("Congress granted the Court of International Trade exclusive jurisdiction over suits *relating to* 'tariffs, duties, fees, or other taxes on the importation of merchandise,' but not if they are for 'the raising of revenue.' 28 U.S.C. § 1581(i)(2).") (emphasis added); *cf. In re Gregory*, 705 F.2d 1118, 1122 (9th Cir.1983) (construing "provide for" to mean "make a provision for," "deal with" or "refer to"). Under this more expansive definition, the subject matter here falls squarely within the exclusive jurisdiction of the Court of International Trade, under subsection 1581(i)(2), because the claims raised here "relate to" duties. Further, to the extent the appellants seek revocation of duty-free status, and consequently enforcement of import duties imposed under other statutes, jurisdiction also lies with the Court of International Trade under subsection (i)(4) of section 1581 which grants that court exclusive jurisdiction over "administration and enforcement with respect to the matters referred to in [§ 1581(i) ]." 28 U.S.C. § 1581(i)(4).

My determination that the Court of International Trade has exclusive jurisdiction over this action is supported not only by the language of subsection 1581(i) but also by its legislative history and by the views of other courts. It is consistent with Congress's characterization of the subsection as a "broad jurisdictional grant" enacted

"to eliminate the confusion which currently exists as to the demarcation between the jurisdiction of the district courts and the Court of International Trade" and thereby "to eliminate much of the difficulty experienced by international trade litigants who in the past commenced suits in the district courts only to have those suits dismissed for want of subject matter jurisdiction." H.R.Rep. No. 1235, 96th Cong., 2d Sess. 47 (1980), U.S.Code Cong. & Admin.News 1980, pp. 3729, 3758. Moreover, because this action arises under the Trade Act of 1974, of which the GSP is a part, my interpretation also promotes Congress's expressed intent that "the expertise and national jurisdiction of the Court of International Trade and the Court of Appeals for International Trade, Patents and Trademarks be exclusively utilized in the resolution of conflicts and disputes *arising out of the tariff and international trade laws,* thereby eliminating the present jurisdictional conflicts between these courts and the federal district and appellate courts." [2] *Id.* at 28, U.S.Code Cong. & Admin.News 1980, p. 3739 (emphasis added). Finally, I note that the Court of International Trade has itself consistently exercised jurisdiction over disputes arising under subsections 2463(b) and (c) of the GSP, determining whether specific imported items are "eligible articles" so as to warrant duty-free treatment, and that the Federal Circuit Court of Appeals has implicitly recognized such jurisdiction by undertaking review of the court's decisions in those cases. *See, e.g., Azteca Milling Co. v. United States,* 890 F.2d 1150 (Fed.Cir.1989); *Madison Galleries, Ltd. v. United States,* 870 F.2d 627 (Fed.Cir.1989); *North American Foreign Trading Corp. v. United States,* 783 F.2d 1031 (Fed.Cir.1986); *Torrington Co. v. United States,* 764 F.2d 1563 (Fed.Cir. 1985); *see also Luggage and Leather Goods Mfrs. of Am. v. United States,* 7 C.I.T. 258, 588 F.Supp. 1413 (1984) (challenge to "eligible article" determination

within court's jurisdiction); *cf. Barclay Indus., Inc. v. Carter,* 494 F.Supp. 912, 914 (D.D.C.1980) (challenge to revocation of duty-free status under GSP within exclusive jurisdiction of Customs Court).

For the preceding reasons, I would affirm the district court's order of dismissal on the ground that the subject matter of this action is within the exclusive jurisdiction of the Court of International Trade.[3]

SENTELLE, Circuit Judge, concurring:

Though I join in affirming the dismissal of the present action, I do not hold Judge Henderson's view that the Court of International Trade ("CIT") has exclusive jurisdiction. On this issue I share the view of the District Court. I also share the District Court's belief that this case is not justiciable, but on the ground that the "human rights" organizations and the labor unions lack standing.

## I. DISTRICT COURT'S JURISDICTION

The argument for exclusive jurisdiction in the CIT rests on 28 U.S.C. § 1581(i)(2), which grants that court "exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers that arises out of any law of the United States *providing for* ... (2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." *Id.* (emphasis added). As the District Court noted, "this action does not appear to arise out of a law of the United States *'providing for'*" the charges enumerated in § 1581(i)(2). *International Labor Rights Educ. & Research Fund v. Bush,* 752 F.Supp. 490, 491 (D.D.C.1990). The General System of Preferences ("GSP"), out of which this action arises, authorizes the grant of duty-free status to goods of certain countries; but, it does not "provide for" such duty or any of the other related payments listed in 28

---

**2.** In 1982, the Court of Appeals for International Trade, Patents, and Trademarks was abolished and its appellate functions assumed by the newly created Court of Appeals for the Federal Circuit. *See* Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25.

**3.** In view of my proposed disposition, I do not believe it necessary to reach the justiciability questions addressed by the district court and my colleagues.

U.S.C. § 1581(i)(2). As the District Court noted, "these duties are 'provided for' ... not by the GSP but by other statutes." 752 F.Supp. at 492.

I do not read *K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 108 S.Ct. 950, 99 L.Ed.2d 151 (1988), as compelling any other than a literal reading of the words of § 1581(i)(2). True, in that case the Supreme Court did state that § 1581(i)(2) granted the CIT "exclusive jurisdiction over suits *relating to* 'tariffs, duties, fees, or other taxes ...'" *Id.* at 188, 108 S.Ct. at 959 (emphasis added; quoting 28 U.S.C. § 1581(i)(2)). However, that statement is literally correct whether we apply to the statute the District Court's plain meaning interpretation or a broader construction. The Supreme Court, in the quoted dicta, does not appear to have been setting limitations on the meaning of the phrase "providing for," nor furnishing synonyms. Instead, the Supreme Court's concern in *K Mart* was whether a Treasury Department regulation permitting importation of certain "gray market goods" fell within the jurisdiction of the CIT under 28 U.S.C. § 1581(i)(3), or of a District Court under either general federal question jurisdiction, 28 U.S.C. § 1331, or trademark jurisdiction, 28 U.S.C. § 1338(a). *K Mart*, 485 U.S. at 182–84, 108 S.Ct. at 956–57. The side reference to suits "relating to" tariffs and so forth under § 1581(i)(2) was offered by the Court simply by way of an example of the CIT's exclusive jurisdiction. Clearly, the Court did not purport to be delimiting that jurisdiction. Here we must, and I do not think the words "providing for" can bear the interpretation that Congress intended to grant exclusive jurisdiction over all cases "relating to" the object of that grammatical phrase.

I do not read the decisions of the Court of Appeals for the Federal Circuit as being to the contrary. In *North American Foreign Trading Corp. v. United States*, 783 F.2d 1031 (Fed.Cir.1986), that circuit reviewed a decision of the CIT upholding the imposition of tariffs against a defense based on the GSP. Such a case, indeed, arises out of a "law of the United States providing for ..." tariffs and duties, or

certainly out of "administration and enforcement with respect to the matters referred to in [§ 1581(i)]." 28 U.S.C. § 1581(i)(4). Likewise, in *Madison Galleries, Ltd. v. United States*, 870 F.2d 627 (Fed.Cir.1989), the Federal Circuit affirmed a decision of the CIT, *Madison Galleries, Ltd. v. United States*, 12 C.I.T. 485, 688 F.Supp. 1544 (1988), which had upheld a Customs Service classification of imported goods as not being the product of a beneficiary developing country within the meaning of the GSP. Again, that action did arise out of the law that imposed (provided for) the duty; it was only the defense that arose out of the GSP. *Madison Galleries*, 870 F.2d at 629–31. *See also Azteca Milling Co. v. United States*, 890 F.2d 1150, 1150–51 (Fed.Cir.1989) (as in *Madison Galleries*, defense based on GSP). In each of those cases, therefore, the underlying action did in fact arise out of the statute imposing (providing for) the tariff or duty. It was only the defense that arguably arose out of the GSP. In the present case, the asserted action arises, if at all, out of the GSP, not out of the law providing for the duty.

In short, though I do not think the issue free from doubt, I would conclude that the District Court did not err in its determination that the present action was outside the exclusive jurisdiction of the CIT. I would affirm the action of the District Court, but on a different basis. Regardless of whether the District Court is correct in its decision that the complaint states no justiciable claim (and it may well be correct), appellants have no standing under Article III of the Constitution to assert such a claim.

## II. STANDING

Appellants fall into two groups: labor unions and "human rights" organizations. To invoke the Article III powers of the District Court, and derivatively succeed in this appeal, at least one of those groups must demonstrate standing in a constitutional sense. To do so, such group must allege and prove three elements: (1) personal injury; (2) fairly traceable to the defendants' allegedly unlawful conduct;

and (3) likely to be redressed by the requested relief. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). For the reasons more fully set forth below, neither group succeeds.

### A. The "Human Rights" Organizations

Twelve of the appellant organizations describe themselves as "human rights" organizations.[1] These organizations fail to cross even the first threshold of standing. They have alleged no personal injury. To meet this requirement of Article III standing, an organization would have to allege an injury that is distinct, palpable and personal to the plaintiff. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). The "human rights" appellants alleged low living standards and poor working conditions among foreign workers abroad as injury resulting from the allegedly unlawful implementation of the GSP by the appellee officials. While I do not doubt the sincerity of the organizations in asserting their interest in these alleged problems, such an interest is insufficient to afford Article III standing. As we have noted before, a "sincere, vigorous interest in the action challenged, or in provisions of law allegedly violated, will not do to establish standing if the party's interest is purely ideological, uncoupled from any injury in fact." *Capital Legal Foundation v. Commodity Credit Corp.,* 711 F.2d 253, 258 (D.C.Cir. 1983). The alleged injury here simply did not happen to the appellant organizations or their members; it happened, if at all, to someone else. To have standing to bring any claim, a party must sustain injury in

fact. *See, e.g., DKT Memorial Fund, Ltd., Inc. v. Agency for International Development,* 887 F.2d 275, 297 (D.C.Cir.1989).

I do not, of course, mean to imply that the allegations of injury stated by these organizations meet the causation and redressability tests. It certainly is not plain from the face of the complaint that the alleged failure of the agencies to enforce the GSP caused poverty and poor working conditions in "developing countries," or that those conditions would be alleviated by the enforcement of the GSP. However, I do not address those questions as the "human rights" organizations do not even meet the first criterion for bringing them before us.

### B. The Labor Organizations

The labor organizations[2] come one step closer to achieving standing, but only one step. So far as alleging injury is concerned, these organizations do so. They allege that their members have suffered injury in fact from international competition in textiles and manufacturing goods. When an organization's members have suffered injury in an organizationally related matter, then the organization derivatively has met the element of standing, and generally in its own right. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982).

However, the unions do not make it past the other standing thresholds. Any causal connection between the grant of beneficiary developing country status to the countries in question and the loss of jobs is at best a tenuous one. And there is no possibility that the unions have crossed the

1. International Labor Rights Education and Research Fund; Human Rights Watch; North American Coalition for Human Rights in Korea; Lawyers Committee for Human Rights; Council on Hemispheric Affairs; Institute for Policy Studies; Asia Resource Center; Washington Office on Haiti; Massachusetts Labor Committee in Support of Democracy, Human Rights and Non–Intervention in Central America; American–Arab Anti–Discrimination Committee; Columban Fathers Justice and Peace Office; and Bread for the World.

2. American Federation of Labor and Congress of Industrial Organizations; International Un-

ion of Electronic, Electrical, Salaried, Machine, and Furniture Workers; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America; American Federation of State, County and Municipal Workers; United Steelworkers of America; International Longshoremen's and Warehousemen's Union; International Ladies Garment Workers Union; Amalgamated Clothing and Textile Workers Union; Communication Workers of America; International Association of Machinists & Aerospace Workers; and United Electrical Workers.

third step. That is, they have not established the redressability of the alleged injury in the current lawsuit.

The alleged injury is that union members have lost jobs. The relief prayed is that the appellees be compelled to apply the GSP statute in a manner "consistent with the intent of Congress." Brief for Appellants at 43. Should the appellees apply the statute in some manner dictated precisely by appellants, there is still no guarantee, nor even strong reason to believe, that the members of the unions will regain their prior employment. Indeed, it may be that the working conditions in the foreign countries will improve as prayed by the "human rights" organizations. It may be that such improvement will be sufficiently costly that some of the members of the labor groups regain jobs as a result of less threatening competition from overseas, or it may not. It may be that no one will benefit, as the foreign competition will not make any changes and yet domestic producers will still not rehire union labor. These are simply a few of the limitless possibilities.

The attenuation of the injury alleged and the official action challenged by labor appellants is closely analogous to that of the petitioners in *Allen v. Wright* itself. In that case, the petitioners were parents of black public school children who alleged that the IRS unconstitutionally granted tax-exempt status to racially discriminatory private schools. Neither the petitioners nor their children had applied for admission to the schools whose exemptions they sought to end. Their alleged injury was that the children's ability to receive education in a racially integrated school had been diminished in that without the tax exemption of the private schools, it was less likely that white persons would have taken their children out of the public schools. In rejecting that theory of standing, the Supreme Court treated the problem in terms of causation rather than redressability, holding that "the line of causation between that conduct and desegregation of respondents' schools is attenuated at best." 468 U.S. at 757, 104 S.Ct. at 3328. The Court went on to note that "from the perspective of the IRS, the inju-

ry to respondents is highly indirect and 'results from the independent action of some third party not before the court.' " *Id.* (quoting *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976)).

As we noted in *Fulani v. Brady*, 935 F.2d 1324 (D.C.Cir.1991), Article III standing is absent where "the presence of intervening factors" interrupts the chain of traceability and redressability. *Id.* at 1330. That is, there is generally no standing "where 'the plaintiff seeks to change the defendant's behavior *only as a means* to alter the conduct of a third party, not before the court, who is the direct cause of the plaintiff's injury.' " *Id.* (quoting *Common Cause v. Department of Energy*, 702 F.2d 245, 251 (D.C.Cir.1983)). In *Fulani*, the appellant sought to have the Court order the Secretary of the Treasury to remove the tax-exempt status of the Commission for the Presidential Debates, in the hope that that would influence the Commission to permit her participation in its presentations. In *Common Cause*, a consumer organization sought an injunction directing the government to develop an energy conservation plan in the hope of leveraging third-party fuel suppliers into making pricing and allocation decisions more consistent with the organization's view of the public interest. Neither of these attempts to influence third-party action was within Article III concepts of causation and redressability. Neither is the attempt in the present case. Appellants in *Fulani* and *Common Cause* lacked standing—so do the labor organizations now before the Court.

Chief Judge Mikva's arguments to the contrary are well worded, but hardly convincing. He may well be correct that "Congress's intentions about causation and redressability must be deferred to unless they are plainly irrational." Dissent at 756. However, since Congress has expressed no such intention about causation and redressability relevant to the question before us, the statement does not affect my resolution. Congress has expressed its

intention that beneficiary developing countries should not receive the statutory preferences under certain circumstances. This does not compel, or even suggest, a congressional expression of intention that labor unions have standing to sue the officials responsible for the GSP to compel a particular line of action, or for any other relief. Chief Judge Mikva to the contrary notwithstanding, any connection between the actions of appellees in this case and wage concessions, real or potential, by the labor unions remains, in my view, tenuous, and I have read no congressional pronouncement to the contrary.

It would be as accurate to say that the Supreme Court, in *Allen v. Wright*, ignored the dictates of the Constitution by not affording standing to the petitioners there as it is to charge that I have ignored congressional intent in not finding standing here.

### III. CONCLUSION

For the reasons set forth above, I conclude that the organizations lack standing. For that reason, I join in the conclusion that the District Court's dismissal must be affirmed.

MIKVA, Chief Judge, dissenting:

To improve labor conditions at home and abroad, Congress passed a law forbidding the Executive from giving trade preferences to developing countries that violate worker rights. A group of labor unions and human rights organizations claim that because the Executive has ignored the law and continued to give trade preferences to offending countries, they have suffered the very injuries that Congress sought to avoid. Since the law was passed expressly for their benefit, the unions seem ideally suited to challenge the Executive's failure to enforce it. And their central claim—that the regulations implementing the statute are inconsistent with the statute itself—is plainly susceptible to judicial review. Although the political context of this case is controversial, in short, the statutory question is entirely straightforward. I think the District Court was wrong to dismiss the complaint as nonjusticiable, especially since it ignored the central claim, and

I would reverse and remand with instructions to decide whether the regulations are consistent with the statute.

My colleagues, however, have resurrected jurisdictional objections that failed to persuade even the District Court, and have affirmed the dismissal of the complaint for two different reasons. I dissent, respectfully, from both. I agree with Judge Sentelle, with the District Court, and with the government (which conceded the point repeatedly at oral argument and afterwards) that the Court of International Trade does not have exclusive jurisdiction over the case. And although I am prepared to agree that the human rights organizations lack standing, I find it inconceivable that the labor unions lack standing. Their members are not only within the "zone of interest" Congress sought to protect; the law was passed specifically to protect their interests. They allege that their members are currently experiencing the very injury that Congress intended the statute to cure: pressure to make wage concessions, not merely (as Judge Sentelle suggests) loss of jobs. Under any standard of deference to Congress, it seems obvious to me that the injury would be redressed if the statute were enforced; and I am troubled that this Court has treated Congress's intentions so nonchalantly.

### I. BACKGROUND

Because the statutory and procedural history is relevant to the jurisdictional claims, I think it deserves more detailed review than my colleagues have provided. The appellants, twenty-three labor unions and human rights organizations argue that President Bush, his Trade Representative, and five members of his cabinet have failed to enforce the worker rights provisions of the Generalized System of Preferences of the Trade Act of 1974 (GSP), 19 U.S.C. §§ 2461–66. The GSP was passed to allow countries that have been designated by the President as "beneficiary developing countries" (BDCs) to export goods duty-free to the United States. The original version contained seven conditions that the countries had to meet before the President

could certify them. (No beneficiary, for example, could be a communist country, or a member of OPEC). *Id.* § 2462(b).

In 1984, the Reagan administration proposed a ten-year extension of the GSP without substantial changes. Congress, however, was concerned that the real beneficiaries of the program were "narrow privileged elites" in the BDCs, *H.R.Rep. No. 90–1090* 98th Cong., 2d Sess. 11, *reprinted in 1984 U.S.Code Cong. & Admin.News* 4910, 5111, and that the GSP program was encouraging U.S. employers to relocate to developing countries, where they could take advantage of cheap labor. *Id.* at 5111–12. To reduce the exploitation of workers abroad and the loss of jobs at home, Congress added a new condition: the President "shall not designate any country ... if such country has not or is not taking steps to afford internationally recognized worker rights to workers in the country." 19 U.S.C. § 2462(b). Congress also included a five part definition of "internationally recognized worker rights" to clarify the standard, including the rights of association, collective bargaining, minimum wages, and occupational safety. *Id.* § 2462(a)(4).

The President, in turn, delegated authority for administering the GSP program to the U.S. Trade Representative. *Exec. Order* 11846, 40 *Fed.Reg.* 13456 (March 27, 1975). After the 1984 amendments, the committee responsible for administering the GSP (which includes all the appellees except for the President) promulgated regulations providing that an "interested party" can petition the GSP committee to review whether a country is in compliance with the worker rights standard. 15 C.F.R. Part 2007 (1988). In particular, the regulations require that a petition include "substantial new information" before a previously reviewed country will be reviewed again. 15 C.F.R. § 2007.1(a)(4).

Between 1985 and 1990, the twenty-three human rights organizations and labor unions submitted petitions under the regulations arguing that several BDCs had failed to comply with the worker rights standard. All of the groups then joined to seek judicial review of what they allege is the GSP Committee's "systematic failure to enforce the mandatory language of the worker rights provision consistent with the intent of Congress." Complaint ¶¶ 53a–k.

After the District Court rejected the claim that the case was within the exclusive jurisdiction of the Court of International Trade, 752 F.Supp. 490 (D.D.C.1990), the appellants sought a preliminary injunction requiring the GSP Committee to conduct an immediate review of Malaysia's compliance with the worker rights standard. They alleged that Carla Hills, the Trade Representative, had extended Malaysia's GSP benefits even after she found that Malaysia was violating worker rights. The GSP Committee rejected the petitions, claiming that they did not contain the "new information" that 15 C.F.R. § 2007.1(a)(4) requires. The appellants also argued in their motion that the "new information" regulation conflicts with the GSP statute, since countries that fail to guarantee worker rights will retain their BDC status until challenged by "new information."

The District Court dismissed the Complaint for failure to state a claim, holding that appellant's claims were not justiciable "since in all respects the determinations required are 'committed to agency discretion' and review is forbidden by" the A.P.A. 752 F.Supp. at 499. It also dismissed as moot the request for a preliminary injunction requiring the GSP Committee to review the Malaysia case.

After the District Court issued its opinion, this Court decided that the President is not an "agency" for purposes of the A.P.A. *Armstrong v. Bush*, 924 F.2d 282 (D.C.Cir. 1991). The appellants argue that since the President is not a member of the GSP committee, and was not involved in any of the decisions disputed here, *Armstrong* has no effect on the case except to allow the President to move to dismiss himself as a party. But they add that if the facts reveal that the President was "directly involved in refusing to comply with an express statutory command," they would seek leave to request mandamus relief.

## II. ANALYSIS

### A. *Standing*

To establish organizational standing, the labor unions and human rights organizations must "plausibly (1) allege injury in fact derived from the agency's action or inaction [and remediable by the court's order to defendant], and (2) assert that the injury is arguably within the zone of interests protected or regulated by the law on which the complaint is founded." *Hotel and Restaurant Employees Union, Local 25 v. Smith*, 846 F.2d 1499, 1509 (D.C.Cir. 1988) (separate opinion of Mikva, J.), *quoting Capital Legal Found. v. Commodity Credit Corp.*, 711 F.2d 253, 259 (D.C.Cir. 1983). The requirements of injury, causation, and redressibility are constitutional; the zone of interests test is prudential. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

I agree with Judge Sentelle that the human rights organizations lack standing because they fail to allege adequate injury. An "organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). If, however, a group points to a "concrete and demonstrable injury to [its] activities," not "simply a setback" to its "abstract social interests," it will have satisfied the Article III injury requirement. *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990), *quoting Havens Reality Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982).

Our own cases have taken the distinction between organizational and social interests seriously. In *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931 (D.C.Cir. 1986), for example, the government's failure to disclose information diminished the Alliance's capacity to refer its members to appropriate services. And in *Ukrainian–American Bar Assn. v. Baker*, 893 F.2d 1374 (D.C.Cir.1990), the government's refusal to give the Association access to political asylees denied it the ability to communicate its message. In this case, by contrast, the ability of the human rights groups to collect and provide information does not seem to have been impaired.

The groups do allege two specific injuries. First, they allege that the executive's failure to enforce the worker rights provisions harms their organizational interest in the "protection of exploited workers." Complaint ¶ 50. But this must be an abstract social interest rather than a concrete organizational injury, if the distinction is to have any meaning. More promisingly, they allege that the executive's failure to enforce the worker rights provisions has forced them to waste their organizational resources in the "largely empty ritual" of the petition process. Complaint ¶ 49. But I am not convinced that this amounts to the concrete "drain on the organizations['] resources" that *Havens Reality* requires. 455 U.S. at 379, 102 S.Ct. at 1124.

In both *Havens Reality* and *Spann*, the plaintiff organizations had to increase significantly the resources they devoted to combatting defendants' illegal racial discrimination. In this case, however, the fact that the human rights organizations choose to file "largely empty" petitions with the GSP rather than to promote awareness of human rights in other ways does not seem to have depleted their resources significantly. I recognize that the need to file petitions in the first place could itself be considered a demonstrable injury, since the organizations allege that the petition process is inconsistent with the statute. But because the drain on organizational resources is not obvious, and because the human rights organizations are less directly within the zone of interests that Congress intended to protect than the labor unions are, I am prepared to agree on prudential grounds that the organizations lack standing.

The labor unions are an entirely different matter. It is hard, in fact, to imagine organizational plaintiffs who are better positioned to meet the constitutional and prudential requirements of Article III. Congress passed the worker rights provisions for the benefit of their members; and they allege that the executive's refusal to en-

force the law caused their members to suffer the precise injuries the law was passed to avoid. In my view, Judge Sentelle focuses on only half of the injury, and moves too quickly over Congress's findings about causation and redressibility.

The government concedes that the unions have adequately alleged injury. And it seems clear to me that the injury is directly within the zone of interests that the law was passed to protect. In their complaint, the unions point to at least three domestic interests reflected in the legislative history. First, Congress sought to stem the loss of jobs as employers leave the U.S. to hire cheap labor in developing countries. Second, Congress recognized that when foreign countries allow their workers to be exploited, American companies exporting from the countries receive an unfair subsidy which results in the loss of U.S. jobs. Third, Congress concluded that failure to enforce internationally recognized worker rights causes labor standards in this country to decline as employers threaten to relocate to developing countries to win concessions from U.S. employees. Complaint ¶ 37.

The unions' allegations are supported by the legislative history. Congressman Pease, the sponsor of the worker rights provision, identified two separate injuries:

> [1] The lack of basic rights for workers in BDC's is a very important inducement for capital flight and overseas production by U.S. industries.... [2] The threat, whether explicit or implicit, by American-based multinational corporations to transfer domestic production from the United States to other countries in which there are no labor rights serves as a powerful inducement to force American workers to relinquish legitimate rights won through several decades of personal hardship and struggle....

130 *Cong.Rec.*, E978–79 (March 14, 1984). As a statement by a sponsor of the amendments, "this explanation deserves to be accorded substantial weight." *Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 564, 96 S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1976).

The unions allege that their members have suffered precisely the injuries that Congress sought to avoid—lost jobs and lower working standards—because of the executive's failure to enforce the law. They cite figures compiled by the Labor Department which suggest that, between April 1975 and October 1989, 1,223,280 American union members were certified under the Adjustment Assistance Act to receive aid because foreign competition caused them to lose their jobs. They also argue that threats from employers to relocate to countries where worker rights are not respected have forced them to make wage concessions.

It seems clear to me that the injury the unions allege is "fairly traceable" to the conduct they challenge and is likely to be redressed by a decision in their favor. In ruling on a motion to dismiss for lack of standing, the "reviewing courts must accept as true all material allegations of the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). When the relief requested is simply the cessation of illegal conduct (in this case, the unlawful granting of trade preferences), the Court has noted that the "fairly traceable" and "redressibility" analyses are identical. *Allen v. Wright*, 468 U.S. at 753 & n. 24, 104 S.Ct. at 3325 & n. 24. Judge Sentelle concludes that the causal connection is "tenuous," and that "there is still no guarantee" that union jobs will be recovered if the law is enforced. Sep.Op. at 750–51. He provides a list of the "limitless possibilities" that might pose impediments to effective relief. *Id.* at 751. But "[n]othing in our prior cases requires a party seeking to invoke federal jurisdiction to negate the kind of speculative and hypothetical possibilities suggested in order to demonstrate the likely effectiveness of judicial relief." *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 78, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978).

By passing the statute, in any event, Congress found not a "tenuous" but a clear connection between the enforcement of

worker rights abroad and improvement of labor conditions at home. After carefully considering the problem, it concluded that the trade preferences for countries that violate worker rights were *causing* U.S. employers to relocate to developing countries and helping them extract unfair concessions from American workers. *See, e.g.,* H.R.Rep. No. 98–1090, 98th Cong., 2d Sess. 11, *reprinted in 1984 U.S.Code Cong. & Admin.News* 5111–12. Conversely, Congress thought it likely that withdrawing trade preferences from offending countries would *redress* the injuries by removing the incentive for U.S. employers to relocate and by reducing the pressure on U.S. employees to give unfair wage concessions for fear of losing their jobs to exploited foreign labor. *Id.* In light of explicit language in the Committee Report, combined with explicit statements by the Congressional sponsor, I do not understand how Judge Sentelle can maintain that "Congress has expressed no such intention about causation and redressability relevant to the question before us." Sep.Op. at 751.

Judge Sentelle's conclusion reflects the fact that he focuses exclusively on the first injury Congress identified (loss of jobs) and ignores the second injury (pressure to make labor concessions). I cannot agree that unemployed union members would have to "regain their prior employment" for the union's injuries to be redressed. Sep.Op. at 751. The redressibility test would be satisfied if *working* union members felt less pressure to make labor concessions after trade preferences were withdrawn. This, of course, is precisely what Congress expected to happen when it passed the GSP statute in the first place. And our circuit has held repeatedly that Congressional findings about causation and redressibility deserve the greatest deference. *See, e.g., Public Citizen v. F.T.C.,* 869 F.2d 1541, 1549 (D.C.Cir.1989); *National Wildlife Federation v. Hodel,* 839 F.2d 694, 709 (D.C.Cir.1988); *Autolog Corp. v. Regan,* 731 F.2d 25, 31 (D.C.Cir. 1984); *see also Defenders of Wildlife, Friends of Animals & Their Environ-*

*ment v. Hodel,* 851 F.2d 1035, 1043 (8th Cir.1988).

Judge Sentelle suggests that *Allen v. Wright* and *Fulani v. Brady,* 935 F.2d 1324 (D.C.Cir.1991), are "closely analogous" to this case. The cases strike me as entirely different: neither involved explicit Congressional conclusions about causation and redressibility. I am not persuaded, similarly, that this case looks like *Common Cause v. Department of Energy,* a third party standing case based on a "nebulous" economic premise that Congress had never endorsed. 702 F.2d 245, 251 (D.C.Cir.1983). In *Common Cause,* the plaintiff sought "to change the defendant's behavior *only as a means* to alter the conduct of a third party, not before the court, who is the direct cause of the plaintiff's injury." *Id.* In this case, the unions seek the enforcement of a law passed specifically for their benefit, because Congress believed that it would reduce pressure on the plaintiffs themselves to make wage concessions. Whether or not the foreign governments change their behavior, the unions argue that their injury will be redressed if the illegal trade benefits are withdrawn.

Because I think Congress's intentions about causation and redressibility must be deferred to unless they are plainly irrational, I am convinced that the unions have standing. Different members of this Court, of course, have disagreed vigorously about how much deference is due to Congress in this area. *See, e.g. Center for Auto Safety v. Thomas,* 847 F.2d 843 (D.C.Cir.1988) (en banc) (separate opinions of Wald, Buckley, Silberman, and Williams, JJ.), *vacated,* 856 F.2d 1557 (D.C.Cir.1988) (en banc). But even judges who are inclined to give less deference rather than more have repudiated the suggestion "that courts should pay *no* attention to Congress's predictions of the effect of legislation. 'As a matter of comity, it is unseemly for a federal court to ignore such legislative opinion.'" *United Transp. Union v. I.C.C.,* 891 F.2d 908, 916 (D.C.Cir.1989) (emphasis added), *quoting Dellums v. Nuclear Regulatory Comm'n,* 863 F.2d 968, 978 (D.C.Cir.1988). Judge Sentelle, in my view, entirely ignores Congress's prediction that

the worker rights provision would reduce not only loss of jobs but also pressure to make wage concessions. And this Court has no business second-guessing Congress's judgment about the appropriate remedy for a perceived social ill.

Even if I were inclined to give no deference to Congress's intention, the second prediction seems to me "self-evidently plausible." *See Public Citizen v. F.T.C.*, 869 F.2d at 1553. The District Court found that the unions had lost jobs as a result of the flight of U.S. companies seeking cheap, unregulated labor. It seems not "tenuous" but logical to conclude that the pressure to make wage concessions would be reduced if the statute were enforced. Since I am convinced that the unions have standing, I turn to the remaining jurisdictional objections.

## B. *The Political Question Doctrine*

Although the District Court did not invoke the political question doctrine directly, it seemed inclined to defer to the Executive simply because the case implicates foreign policy. *See, e.g.*, 752 F.Supp. at 498 ("The complaint strikes directly at the President's discretionary authority in a broad area of foreign relations generally and under the statute at issue particularly.") And for the first time on appeal, the GSP committee argues openly that the political question doctrine bars judicial review of its interpretation of the GSP statute.

But the Supreme Court has made it clear that the political question doctrine does *not* bar judicial review of a challenge to Executive compliance with a federal statute, even if the challenge involves important questions of foreign affairs. In *Japan Whaling Asso. v. American Cetacean Soc.*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), the Court rejected the argument that the political question doctrine prevented it from deciding whether the Secretary of Commerce properly interpreted a federal statute requiring him to impose sanctions against any country that failed to comply with the International Whaling Convention. "Under the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones." *Id.* at 230, 106 S.Ct. at 2866.

In *DKT Memorial Fund Ltd. v. Agency for International Development*, 810 F.2d 1236 (D.C.Cir.1987), similarly, the question was whether the Agency for International Development's implementation of a policy committing the United States not to fund any population control program in a developing country if it "actively promotes abortion as a method of family planning" was inconsistent with the Agency's authorizing legislation. We held that "whereas attacks on foreign policymaking are nonjusticiable, claims alleging non-compliance with the law are justiciable, even though the limited review that the court undertakes may have an effect on foreign affairs." *Id.* at 1238. Like *Japan Whaling* or *DKT Memorial Fund*, this case presents a conventional statutory question, not a political one, and it clearly is justiciable.

## C. *Agency Discretion*

Finally, I would reverse the District Court's conclusion that judicial review of the worker rights provision is barred "since in all respects the determinations required are 'committed to agency discretion' and review is forbidden by" the A.P.A. 752 F.Supp. at 499, *citing Webster v. Doe*, 486 U.S. 592, 600–01, 108 S.Ct. 2047, 2052, 100 L.Ed.2d 632 (1988); *Heckler v. Chaney* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In particular, the District Court decided that it could not "interfere with the President's discretionary judgement because there is no law to apply." 752 F.Supp. at 497. The government goes further still, arguing that the GSP statute's language confirms that Congress *intended* to preclude judicial review of the President's decision whether to withdraw a country's BDC status. Section [2464(b)] 264(b) of the statute says that the President "shall ... withdraw or suspend the designation of any country as a [BDC] if, after such designation, he determines that

as the result of changed circumstances such country would be barred from designation as a [BDC] under Section 2462(b) of this title." The phrase "if ... he determines," the government argues, commits the decision to withdraw BDC status entirely to the President's discretion, and prohibits the courts from reviewing the decision.

The argument is unconvincing. Every administrative mechanism includes language that permits an agency to make up its own mind about one question or another. But when a statute requires a specific *standard* to be applied in making the determination, judicial review is clearly available. *See, e.g., Population Institute v. McPherson,* 797 F.2d 1062, 1064–65 (D.C.Cir.1986); *Amalgamated Transit Union International v. Donovan,* 767 F.2d 939 (D.C.Cir.1985). More specifically, the language and history of the worker rights provision indicate Congress's intention to preserve judicial review, rather than to preclude it. Congress rejected the Reagan administration's proposal to extend the GSP for ten years without substantial changes because it was concerned that the benefits of the program were not reaching workers in the BDCs but were being siphoned off by "narrow privileged elites." Congressman Pease, the bill's sponsor, said: "[a]s is customary with the Reagan administration's trade policy, there is nothing in the President's bill that recognizes the impact of a program like GSP upon American workers ..." 130 *Cong. Rec.* at E978. It is hard to imagine that Congress meant to give the President unreviewable discretion to enforce the new provisions, since it passed the provisions to constrain his discretion.

The plain language of the statute also suggests that the statutory criteria are meant to be mandatory rather than discretionary:

> [T]he President *"shall not designate* any country ... (7) if such country has not or is not taking steps to afford internationally recognized worker rights to workers in the country...."

19 U.S.C. § 2462(b) (emphasis added).

> [T]he President *shall ... withdraw or suspend* the designation of any country

as a beneficiary developing country if ... he determines that as a result of changed circumstances such country would be barred from designation as a beneficiary developing country under section 2462(b).

*Id.* § 2464(b) (emphasis added).

And the Supreme Court has indicated that mandatory language is a reliable indication that Congress intended the application of a statute to be subject to judicial review. *Overton Park,* for example, upheld the right of judicial review where the statute provided that the Secretary of Transportation "shall not approve any program or project" that uses public parkland. 401 U.S. at 411, 91 S.Ct. at 821. Similarly, *Dunlop v. Bachowki* upheld judicial review where the statute provided that the Secretary of Labor "shall investigate" allegations of violations of union election procedures and "if he finds 'probable cause' to support an allegation ... he shall ... bring a civil action." 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). *Heckler v. Chaney,* finally, held that *Dunlop* was consistent with its ruling that decisions not to enforce statutes are presumptively unreviewable because in *Dunlop,* the presumption was rebutted: "The statute being administered quite clearly withdrew discretion from the agency and provided guidelines for exercise of its enforcement power." 470 U.S. at 834, 105 S.Ct. at 1657. In this case, too, the GSP statute provides detailed guidelines for the granting of trade benefits, 19 U.S.C. § 2462(a)(4), and I would reverse the District Court's conclusion that there is no law to apply.

### D. *The New Information Regulation*

The unions asked the District Court to order the government to apply the GSP statute in a manner "consistent with the expressed language and intent of Congress." I am unpersuaded by some of their more extravagant requests, such as the suggestion that the District Court should tell the Executive precisely what the "taking steps" provision means. Even

when judicial review is available, a reviewing court is not authorized to substitute its judgment for an agency's. *See, e.g. Dunlop*, 421 U.S. at 571, 95 S.Ct. at 1859-60.

But I have no doubt that the District Court erred when it refused to review the unions' most modest and most important charge—that the GSP Committee's "new information" regulations conflict with the worker rights provision. This is the heart of their complaint, and it is clearly susceptible to judicial review under a straightforward *Chevron* analysis.

The unions allege that sections 2007.-0(b)(5) and 2007.1(a)(4) of the United States Trade Representative's regulations create an improper procedural barrier—one that conflicts with the mandatory language of the worker rights provision—by adding a precondition to GSP enforcement that is not found in the statute. Complaint, ¶ 53g. The regulation requires that a petition include "substantial new information" before a previously reviewed country will be reviewed again, regardless of whether the country is, in fact, violating worker's rights. The unions argue that the decision to conduct investigations only in response to petitions violates the express terms of the statute, which requires the Trade Representative to ensure that all countries receiving GSP benefits are in compliance with the worker rights provision, whether or not petitions are filed. Complaint, ¶ 53(d).

*Heckler v. Chaney* does not bar judicial review of the new information regulation. In my view, this is a case of agency action, not agency inaction. "When an agency *does* act to enforce," the *Heckler* court noted, "that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner." 470 U.S. at 832, 105 S.Ct. at 1656 (emphasis in original). Unlike decisions not to prosecute, furthermore, agency regulations are not ordinarily exempt from judicial review under *Heckler. National Treasury Employees Union v. Horner*, 854 F.2d 490, 496 (D.C.Cir.1988). In this case, the Trade Representative has granted trade preferences to developing countries and has passed a regulation refusing to review their worker rights records again unless presented with "new information." The government cannot simultaneously argue that the regulations are *consistent* with the enforcement requirements, and that they amount to a decision *not* to enforce.

But even if the regulation could be considered a nonenforcement, rather than an enforcement decision, it would represent an exception to *Heckler*. As the *Heckler* court noted, even statutes that involve discretion about enforcement actions are reviewable when there is evidence that Congress intended to limit the discretion "either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." 470 U.S. at 833, 105 S.Ct. at 1656. Since the worker rights provisions carefully circumscribed the executive's power to grant trade benefits, *Heckler* would not, in either case, bar review.

### III. CONCLUSION

I cannot accept Judge Henderson's conclusion that the Court of International Trade has exclusive jurisdiction or Judge Sentelle's conclusion that the unions lack standing. And I am convinced that the case is not barred by the political question doctrine, by *Overton Park*, or by *Heckler v. Chaney*, as the District Court suggested. I would remand to the District Court with instructions to determine whether the "new information" regulation was reasonable, or arbitrary and capricious, in light of the language of the statute.